**ENERGY CAPITAL CORP. (as General Partner of Energy Capital Partners Limited Partnership), Plaintiff–Appellee,**

v.

**UNITED STATES, Defendant–Appellant.**

No. 01–5018.

United States Court of Appeals, Federal Circuit.

DECIDED: Aug. 14, 2002.

Michael S. Gardener, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., of Boston, MA, argued for plaintiff-appellee. With him on the brief was Laurence A. Schoen.

Mark L. Josephs, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Stuart E. Schiffer, Acting Assistant Attorney General; and David M. Cohen, Director. Of counsel on the brief were Jeffrey A. Belkin and Allison A. Page, Trial Attorneys. Also of counsel on the brief were Carole W. Wilson, Associate General Counsel; and William Lane, Trial Attorney, Office of General Counsel, Department of Housing and Urban Development, of Washington, DC.

Before CLEVENGER, SCHALL, and LINN, Circuit Judges.

SCHALL, Circuit Judge.

The United States appeals from the final decision of the United States Court of Federal Claims that awarded Energy Capital Corp. ("Energy Capital") $10,082,000 in lost profits in its suit against the United States for breach of contract. *Energy Capital Corp. v. United States,* 47 Fed. Cl. 382 (2000), *amended by Energy Capital Corp. v. United States,* No. 97–23C (Fed. Cl. Dec. 19, 2000). After holding that Energy Capital had established its entitlement to lost profits, the court computed Energy Capital's damages award by discounting its anticipated lost profits to present value as of the date of judgment using a risk-free discount rate. We see no error in the court's award of lost profits damages and its reduction of the award to present value as of the date of judgment. We conclude, however, that under the circumstances of this case, use of a risk-adjusted discount rate was required in arriving at the present value of the damages award. Accordingly, we affirm-in-part, reverse-in-part, and remand.

## BACKGROUND

The Court of Federal Claims made detailed findings of fact in a thorough and well-reasoned opinion. We recite here those facts necessary for an understanding of the case.

### A. The Lack Of Financing For Improvements To Reduce The Cost Of Heating HUD Properties

The Department of Housing and Urban Development ("HUD") subsidizes and regulates a significant portion of the multifamily housing industry in the United States. *Energy Capital Corp. v. United States,* 47 Fed. Cl. at 386. The Federal Housing Administration ("FHA"), which is part of HUD, provides financial assistance to various types of housing programs. *Id.*

A continuing problem for HUD has been the fact that the multifamily housing in its

portfolio consumes an inefficient amount of energy. The reason for that is that many HUD properties [1] were constructed during the late 1960s and early 1970s when neither the government nor the builder was concerned with long-term energy costs. HUD housing frequently was built under stringent cost restraints. Consequently, the housing commonly was heated with electric baseboard resistance heating—a type of heating that is inexpensive to install, but very expensive to operate. *Id.*

Most of the HUD properties at issue in this case are referred to as "Field Notice" properties. Typically, a Field Notice property was financed by the Federal National Mortgage Association ("Fannie Mae") or one or more private lenders, with repayment of the resulting indebtedness being secured by a first mortgage on the property and the mortgage being insured by FHA. The mortgage and accompanying FHA regulations restricted the owner's ability to encumber the property beyond the first mortgage. Because owners could not place additional mortgages on their properties, they had difficulty raising capital to make physical improvements to their properties, including improvements to reduce heating costs. *Id.* Consequently, very little HUD housing received any financing to reduce energy costs during the 1980s and 1990s. *Id.*

**B. Energy Capital And The AHELP Agreement**

Energy Capital was formed in the middle of 1994. Thereafter, it provided financing to allow various institutions to optimize their energy consumption. For example, Energy Capital provided financing for improvements to college dormitories and to commercial office buildings. In that capacity, it originated approximately $250 million in loans.[2] *Id.*

Eventually, Energy Capital came to recognize that there was a significant need for energy improvements in HUD properties and that the primary obstacles to financing loans for such improvements were the regulatory restrictions noted above. Energy Capital believed that if it could solve the regulatory problem, it would be able to originate a significant number of loans that would provide financing for improvements to reduce energy costs in HUD properties. *Id.*

Over a period of approximately 15 months, Energy Capital negotiated an agreement with HUD to eliminate the regulatory barriers to financing energy improvements in HUD properties. The agreement became known as the "Affordable Housing Energy Loan Program" ("AHELP") agreement. Under the AHELP agreement, Energy Capital could originate loans to owners of HUD properties for 3 years, or until a cap of $200 million in loan originations was reached. *Id.* In exchange, HUD promised to treat AHELP loans in a way that gave Energy Capital, as a lender, security for its loans. Specifically, the AHELP agreement allowed Energy Capital to include in its energy efficiency loans to Field Notice properties what was referred to as a "springing subordinated lien" and a "cross-

---

**1.** For purposes of this opinion, the terms "HUD properties" and "HUD housing" refer to multifamily housing properties that are subsidized, in whole or in part, by HUD through the FHA and that are subject to some form of regulation by HUD.

**2.** A lender who makes a loan to a borrower and then resells the loan obligation to a third party is said to have "originated" the loan to the borrower.

default provision." *Id.* Pursuant to these provisions, if a property owner defaulted on an energy efficiency loan originated under the AHELP agreement, then the first mortgage on the property, which was the FHA-insured mortgage, would also go into default. At the same time, Energy Capital's energy efficiency loan would "spring" into the senior mortgage position, ahead of the loan secured by the FHA-insured mortgage. *Id.* at 388. Of course, before Energy Capital could make such a loan, it would have to obtain the consent of the holder of the first mortgage on the property (the "first mortgagee") to the springing subordinated lien and cross-default provisions. *Id.* at 389.

Energy Capital agreed to structure loan payments so that, in the case of each loan, the anticipated savings in utility costs due to the energy improvements being financed would cover 110% of the annual loan payment. Thus, it was contemplated that the energy loan would pay for itself and would give the property owner additional savings in the form of reduced energy costs. The AHELP agreement also set the interest rate at which Energy Capital would lend money: the Treasury rate plus 3.87 percent. Energy Capital agreed in principle to obtain capital from Fannie Mae at the Treasury rate for the loans that Energy Capital would be originating. As the AHELP loans were repaid, Fannie Mae would be repaid at the Treasury rate plus 1.87 percent. Energy Capital would keep the remaining 2 percent over Treasury rate as its profit on the loan. In a separate agreement, Fannie Mae promised Energy Capital that it would fund up to $200 million in AHELP loans and would purchase the loans back from Energy Capital. *Id.*

The process for originating an AHELP loan was to begin when Energy Capital received an application, called a "Property Eligibility Checklist" ("PEC"), from a property owner. The PEC would contain certain information about the physical structure and energy systems of the property. Based upon this preliminary data, Energy Capital would determine whether an AHELP loan was viable. "Viable" meant that the proposed improvement would generate enough savings to pay for itself within the loan repayment period. *Id.* at 389–90. If the property appeared viable, an energy service company ("ESCO") would conduct an energy audit to confirm the usefulness of the contemplated energy efficiency measure from an engineering perspective. *Id.* at 390. Energy Capital would also evaluate the financial stability of the property, and it was expected that it would submit some of the loans to HUD for a limited review. The HUD review was limited to 10 days by the AHELP agreement. After loan closing, Energy Capital would oversee construction and would continue to service the loan by administering the loan proceeds and receiving payments on the loan. *Id.*

### C. Execution And Then Termination Of The AHELP Agreement

FHA and Energy Capital executed the AHELP agreement in September of 1996. Its maximum duration was 3 years. Shortly thereafter, HUD issued a notice to the HUD field staff for multifamily housing and to owners and managing agents of HUD properties. In the notice, HUD reviewed the need for energy efficiency measures and announced that the Department had "endorsed" the AHELP program. The notice suggested that interested staff or property owners could contact representatives of Energy Capital for further information. *Id.*

Approximately two months after the AHELP agreement was signed, two train-

ing programs were held for HUD officials and for staffers in HUD field offices in connection with the AHELP program. Witnesses from Energy Capital testified at trial that HUD had asked that Energy Capital train its field office representatives before marketing AHELP to building owners, so that the field staff would be knowledgeable and capable of responding to inquiries from the property owners. *Id.* at 390–91.

Following the training programs, Energy Capital began to market AHELP to property owners and managers. In its marketing efforts, Energy Capital focused in particular on the two largest owners of multifamily housing in HUD's housing portfolio: Insignia and National Housing Partners. Together, these two entities controlled nearly 1,000 properties in the HUD portfolio. Energy Capital representatives presented AHELP to representatives from Insignia and National Housing Partners at two different meetings in November of 1996. *Id.* at 391.

In addition to making presentations to Insignia and National Housing Partners, Energy Capital made sales presentations to various property owners/managers in the Boston, Massachusetts area. These presentations prompted owners to apply for AHELP loans by submitting PECs. *Id.* In conjunction with its activities directed to owners, Energy Capital also developed its internal resources to support AHELP. For example, it retained a search firm to hire a chief operating officer, a chief underwriter, a head of sales, and a sales force. In addition, it selected an energy consulting company as the engineering firm that would evaluate properties for energy viability. As Energy Capital had already received PECs, it retained six ESCOs to conduct energy audits. By

February of 1997, Energy Capital had received 123 PEC forms and had completed the pre-screening process for approximately 22 properties. *Id.*

However, on February 7, 1997, there appeared on the front page of The Wall Street Journal an article stating that Energy Capital had received the AHELP contract in return for significant fund-raising efforts for President Clinton by certain principals of the firm. *Id.* at 392. On Monday, February 10, 1997, The Wall Street Journal, in its Corrections & Amplifications Section, noted that the February 7 article had failed to state that "no one has said that HUD officials knew that the two men were major Democratic fund-raisers." *Id.*

HUD terminated the AHELP agreement on February 14, 1997, approximately 5½ months after it had been signed. In those 5 ½ months, Energy Capital had not completed the process of originating any loans. The AHELP agreement did not have a termination for convenience clause. *Id.*

## D. Energy Capital's Action in the Court of Federal Claims

Energy Capital filed a complaint in the Court of Federal Claims on April 21, 1997, and an amended complaint on November 24, 1997. In its suit, Energy Capital sought to recover damages from the United States for breach of contract. After the government conceded liability for breach of contract, a trial was held on damages. The proceedings focused on the parties' differing views as to the measure of recovery to which Energy Capital was entitled. Energy Capital took the position that it was entitled to lost profits damages, while the government urged that it should only be required to pay reliance damages. *Id.*

The Court of Federal Claims started from the premise that in order to demonstrate entitlement to lost profits, Energy Capital was required to establish the elements of (1) causation, (2) foreseeability, and (3) reasonable certainty. *Id.* at 393. In addition, the court took the position that because AHELP was a new venture, Energy Capital would have a difficult burden establishing that its lost profits were reasonably certain. *Id.*

Following a trial, the court concluded that Energy Capital had carried its burden of proving that its lost profits were reasonably certain. *Id.* at 414–15. In reaching this conclusion, the court resolved various fact issues relevant to the proper measure of damages. On appeal the government does not challenge any of the court's findings of fact. We note the court's pertinent findings as follows:

(i) *Eligibility of Properties with Tenant–Paid Utilities*

The first issue addressed by the Court of Federal Claims was whether properties having apartments with tenant-paid utilities would have received AHELP loans. *Id.* at 397. The government argued that owners of such properties would have had no incentive to apply for AHELP loans because they would not have stood to benefit from any reduced utility expenses. *Id.* at 397–98.

The court rejected the government's argument for several reasons. First, it noted that there was nothing in the AHELP agreement or the AHELP Procedures Manual[3] that expressly excluded properties with tenant-paid utilities. *Id.* at 398. Second, the court found that owners of such properties could have taken over from their tenants the obligation of paying utility charges. In that event, the owners would have had an incentive to apply for AHELP loans, since the owners then would have benefited from decreased utility bills.[4] *Id.* Third, the court noted that before the AHELP agreement was terminated by HUD, Energy Capital had received PECs from property owners with tenant-paid utilities and had not rejected these PECs out of hand. *Id.* at 398–99. The court concluded that this contemporaneous conduct was indicative of the parties' understanding of the AHELP agreement. *Id.* at 399. Fourth, the court determined that it was unlikely that HUD would have found the AHELP Program attractive if properties with tenant-paid utilities were excluded, since excluding such properties would have reduced the number of eligible properties by 25 percent. *Id.*

(ii) *Eligibility of Section 202 Properties*

The next issue addressed by the Court of Federal Claims was whether, in addition to Field Notice properties, so-called "Section 202" properties were eligible to receive AHELP loans. A "Section 202" property takes its name from Section 202 of the Housing Act of 1959. Housing Act of 1959 § 202, 12 U.S.C. § 1701q (1994). A Section 202 property carries a first mortgage that is owned directly by FHA, rather than being insured by FHA. The AHELP agreement specified that Section

---

3. The AHELP Procedures Manual is an exhibit to the AHELP agreement; it sets forth the procedures that Energy Capital was to follow when originating AHELP loans.

4. The court also found that the property owners would have been able to raise rents in conjunction with assuming the payment of utility bills. As a result, the tenants' total monthly payments (utilities plus rent) would have remained roughly the same.

202 properties were eligible for AHELP. At the time when the AHELP agreement was executed, however, the documentation and procedures for issuing AHELP loans to Section 202 properties had not yet been finalized. *Energy Capital,* 47 Fed. Cl. at 399. The agreement therefore stated that "certain elements of this Agreement, the AHELP Loan Documents and the AHELP Procedures Manual must be modified to reflect the structure of 202 ... transactions. Prior to initiating an AHELP transaction for a Section 202 ... development, the Lender shall submit document modifications to FHA for review and approval." *Id.* at 399 n. 13. The government argued that Section 202 properties should not be included in the damages calculation because, before any loans to Section 202 properties could have been made, new legal documents would have had to have been drafted and approved by FHA. *Id.* at 399.

The Court of Federal Claims disagreed. First, it pointed out that the AHELP agreement stated on its face that Section 202 properties were eligible for AHELP loans. *Id.* Second, it noted that prior to HUD's termination of the AHELP agreement, Energy Capital sent two letters to HUD that evinced a consistent intent to make loans to owners of Section 202 properties. *Id.* Third, the court found that FHA's approval of a modification of the AHELP documents to reflect the structure of Section 202 loans would have been obtained in a short amount of time because the financing arrangements for Section 202 properties were actually simpler than for Field Notice properties. *Id.* at 399–400. Fourth, HUD Assistant Secretary Nick Retsinas testified at trial that he was interested in seeing the AHELP program succeed. Based upon that testimony, the court concluded that it was unlikely that

AHELP would have foundered by reason of legal technicalities. Finally, the court determined that once FHA stated in the AHELP agreement that Section 202 properties were eligible for AHELP loans, the government had a duty of good faith to make this promise a reality. For all of these reasons, the court concluded that Section 202 properties were eligible to receive AHELP loans. *Id.* at 400.

(iii) *Number of Energy Viable Properties*

The Court of Federal Claims next addressed the issue of the number of eligible properties that were "energy viable", *i.e.* the number of properties that would have realized sufficient utility bill savings through improved energy efficiency to cover the cost of converting from electric heat to gas heat. The court relied on three overlapping methods provided by Energy Capital's experts to determine the number of such properties. *Id.* Although the court determined that there was an error in each of the three methods, it concluded that the overall analysis of each method was reliable. The court was able to correct for the error in each approach using the evidence in the record. After correction, all three methods produced a number in the range of 15 to 16 percent. Accordingly, the court found that 16 percent of the eligible properties were viable from a technological and energy-efficiency perspective. *Id.* at 403.

(iv) *Willingness Of HUD Property Owners To Obtain AHELP Loans*

An important evidentiary issue addressed by the Court of Federal Claims was the extent to which owners of HUD properties would have been willing to participate in AHELP. In that regard, Ener-

gy Capital presented the testimony of David Smith. Mr. Smith was the founder of Recapitalization Advisors, a consulting firm that Energy Capital had retained during the development of AHELP on account of its extensive knowledge of HUD's housing portfolio. Mr. Smith testified that he estimated that just 34 percent of the owners of HUD properties would not have been willing to participate in AHELP. The court found his testimony to be credible and accepted his estimate as reasonable. *Id.*

The court found that Mr. Smith's estimate was supported by the testimony of owners of HUD properties. Their testimony confirmed Mr. Smith's opinion that most owners would have been interested in AHELP loans. *Id.* As mentioned previously, the two largest owners/managers of properties in the HUD portfolio were Insignia and National Housing Partners. A former vice-president of Insignia and a former asset manager for National Housing Partners testified at trial. Both stated that their respective organizations would have been very interested in participating in AHELP despite some of the potential risks, such as lack of guaranteed energy savings, the need to obtain first mortgagee consent, and the interest rate in repaying the AHELP loans. Both Insignia and National Housing Partners were concerned that energy consumption was draining too much cash flow, but they had found that large scale energy improvements were too expensive. Thus, AHELP was very attractive to them. Insignia's desire to participate was further supported by its submission of approximately 43 PECs before the AHELP agreement was terminated.

The court noted that the willingness of property owners to participate in AHELP was especially important because owners would risk their entire investment in the property. In other words, if property owners were willing to participate, then other entities, such as first mortgagees, who had less to lose (as discussed below) also would have been likely to participate. *Id.* at 403–04.

(v) *Energy Capital's Evaluation of Creditworthiness*

David Smith testified that Energy Capital would have rejected 11 percent of the potentially eligible Field Notice properties because of the lack of creditworthiness of the owner or the low quality of the property. Finding Mr. Smith to be credible, the court accepted his estimate as reasonably accurate. *Id.*

(vi) *First Mortgagee Consent*

The Court of Federal Claims also considered the question of first mortgagee consent. The court noted that it was possible that first mortgagees would have been reluctant to consent to an AHELP loan because, in general, a second loan could increase the chance of default on the loan secured by the mortgage they held. Furthermore, under the cross-default provision contemplated by the AHELP agreement, a property owner's default on the AHELP loan would put the first mortgage into default as well, depriving the first mortgagee of its anticipated interest payments during the term of the mortgage.[5]

Neither party presented testimony from a first mortgagee. Instead, the parties

---

5. In the case of such a default, the first mortgagee would have recovered most of the principal of the loan because the loan was insured by FHA. 47 Fed. Cl. at 404. In the case of an insured loan, FHA typically pays approximately 95 to 99 cents on the dollar. *Id.* at 388.

presented evidence of incentives or disincentives for first mortgagees to consent. The court decided not to draw an adverse inference against either party for failing to call a witness because both parties had first mortgagee witnesses equally available but declined to call them. *Id.* at 406.

With regards to Fannie Mae, which held approximately 40 percent of the first mortgages on Field Notice properties, the Court of Federal Claims found that the most probative evidence was Fannie Mae's promise to fund up to $200 million of AHELP loans and also to purchase the loans back from Energy Capital. *Id.* at 405. The court found that Fannie Mae would have consented to second mortgages (to secure AHELP loans) being placed on all of the properties where it held the first mortgage, because it had risked its own money in support of the program. Furthermore, the court found that because increasing energy efficiency was consistent with Fannie Mae's goals, it was reasonable to conclude that Fannie Mae would have tolerated some risk to its capital. Thus, the court concluded that Fannie Mae would have consented to AHELP loans on 100% of the properties where it was the first mortgagee, which amounted to 40 percent of the total number of properties at issue. *Id.*

With regards to other first mortgagees, David Smith estimated that slightly more than 83 percent of the non-Fannie Mae first mortgagees would have consented to the AHELP program. The government's expert, David Hisey, testified that zero percent of non-Fannie Mae first mortgagees would have consented. *Id.*

The Court of Federal Claims noted that first mortgagees risked losing the future interest income on their loan in the event of a default. *Id.* at 406. The court also noted, however, that the energy savings provided by AHELP energy improvements were designed to exceed the cost of the loan, thereby potentially providing the property owner with increased income. The court noted that this could potentially reduce the probability of default, although the court recognized that energy savings were not guaranteed and that utility rates were unpredictable. *Id.*

The court concluded, based on the evidence, that two-thirds of the non-Fannie Mae first mortgagees (66 percent) would have consented to AHELP loans. *Id.* at 407. The court arrived at this figure by initially finding that it was as likely as not that first mortgagees would consent. Expressing this mathematically as a 50 percent consent rate, the court added a percentage to account for the following incentives to consent: (i) first mortgagees were likely to follow the example of Fannie Mae, the largest holder of first mortgages; (ii) first mortgagees were likely to be influenced by FHA, the insurer of its mortgages; and (iii) Energy Capital was willing to pay a fee to first mortgagees to purchase their consent, a standard practice. The court noted that the 66 percent number was further compelling because it was the average number between two "reasonable" estimates of 50 percent and 83 percent (proposed by Energy Capital's expert). The court dismissed the government's estimate of zero percent, finding it unreasonable. *Id.*

(vii) *Determination of the Amount of Lost Profits*

Based on its findings, the Court of Federal Claims determined that the total dollar amount of loans that would have been originated by Energy Capital had the AHELP agreement not been breached

would have been $224,103,600, which was more than the $200,000,000 maximum amount allowed under the agreement. *Id.* at 410. Consequently, the Court found that Energy Capital would have originated the full amount of $200,000,000. *Id.*

Based on this figure, the court then determined Energy Capital's total revenue and deducted Energy Capital's expenses to arrive at a value of lost profits in the amount of $12,111,000, to be earned over 12 years. *Id.* at 414. The court then discounted the damages award to present value. The government argued that the court should (i) discount the damages award to the date of breach; and (ii) use a risk-adjusted discount rate. The court rejected this approach, concluding that precedent mandated (i) discounting to the date of judgment; and (ii) using a risk-free discount rate. Following this approach, the court arrived at a final discounted damages award of $8,787,000. *Id.* at 421.

After the court issued its decision, Energy Capital moved to alter or amend the judgment pursuant to RCFC 52(b) and 59(d), arguing that the court should correct two mathematical computations contained within the opinion. *Energy Capital v. United States,* No. 97–23C, slip op. at 1 (Fed.Cl. Dec. 19, 2000). The court granted Energy Capital's motion with respect to one of the computations and denied the other. After recalculating and discounting to present value, the court determined that Energy Capital's lost profits amounted to $10,082,000. *Id.* at 8.

The government timely appealed the trial court's decision. We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

■ In reviewing a decision of the Court of Federal Claims following a trial, we review findings of fact for clear error and conclusions of law *de novo. Bd. of County Supervisors v. United States,* 276 F.3d 1359, 1363 (Fed.Cir.2002). The government asserts that it "does not seek to overturn the lower court's factual findings." Rather, the government argues that the trial court "engaged in a degree of speculation that is not permitted as a matter of law." According to the government, the Court of Federal Claims made three errors of law: (i) awarding damages in the form of lost profits in the case of a new venture that never was performed; (ii) engaging in speculation in concluding that the AHELP agreement would have yielded profits for Energy Capital; and (iii) applying a risk-free discount rate and discounting future profits to the date of judgment rather than to the date of the government's breach of contract. We address each of these contentions in turn.

## A. Whether Lost Profits May Be Awarded For A New Venture

The government urges us to adopt a per se rule that lost profits may never be recovered for a new business venture that was not performed. For the reasons explained below, we decline to adopt such a rule.

■ "One way the law makes the non-breaching party whole is to give him the benefits he expected to receive had the breach not occurred." *Glendale Fed. Bank, FSB, v. United States,* 239 F.3d 1374, 1380 (Fed.Cir.2001) (citing Restatement (Second) of Contracts § 344(a) (1981)). "The benefits that were expected from the contract, 'expectancy damages,' are often equated with lost profits, although they can include other damage elements as well." *Id.* (citing Restatement (Second) of Contracts § 347). To recover

lost profits for breach of contract, the plaintiff must establish by a preponderance of the evidence, *see Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 72 F.3d 190, 204 (1st Cir.1995), that: (1) the loss was the proximate result of the breach; (2) the loss of profits caused by the breach was within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstances at the time of contracting; and (3) a sufficient basis exists for estimating the amount of lost profits with reasonable certainty. *See Chain Belt Co. v. United States*, 115 F.Supp. 701, 714, 127 Ct.Cl. 38, 58 (1953); Restatement (Second) of Contracts § 351(1) (1981) ("Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made."). *See also California Fed. Bank v. United States*, 245 F.3d 1342, 1349 (Fed.Cir. 2001)("*Cal Fed*") ("Lost profits are 'a recognized measure of damages where their loss is the proximate result of the breach and the fact that there would have been a profit is definitely established, and there is some basis on which a reasonable estimate of the amount of the profit can be made.'") (quoting *Neely v. United States*, 152 Ct.Cl. 137, 285 F.2d 438, 443 (1961)("*Neely I*")).

The government contends that because Energy Capital was engaged in a new business that had never been performed, the Court of Federal Claims' award of lost profits was speculative and erroneous as a matter of law. In making this argument, the government relies on *Neely I*. In that case, the government breached its agreement to allow the plaintiff to strip-mine certain leased lands for coal, and the plaintiff sought lost profits damages. The government quotes the following passage from *Neely I*:

[P]rofits are uncertain; they depend on so many contingencies, especially in a new enterprise, that it is, in most cases, impossible to say that the breach was the proximate cause of the loss of them, or that a profit would have been realized, in any event; nor is there any basis to determine what they might have amounted to. This is especially true where the breach occurred before operations had begun.

\* \* \* \* \* \*

Suffice it to say that almost always, in the case of a new venture, the fact that there would have been a profit, had there been no breach, is too shrouded in uncertainty for loss of anticipated profits to form a reliable measure of the damages suffered.

*Id.*

Although the above excerpt articulates the principle that lost profits are difficult to establish in the case of a new venture, the subsequent history of *Neely* is not helpful to the government, as was noted by the trial court. The *Neely I* court, after explaining that lost profits are rarely available for a new venture, went on to make it clear that, in fact, lost profits damages could be recovered by the plaintiff. The Court of Claims noted that the plaintiff eventually assigned the lease at issue to a third party, who was allowed to mine the property. *Id.* The court stated that "the profit realized from these operations [by the third party], if, indeed, there were profits, would furnish some basis for a fairly reliable estimate of what plaintiff's profits would have been." *Id.* The court remanded the case to the Trial Commissioner for additional fact-finding regarding the profits earned by the third party. After remand, the Trial Commissioner awarded lost profits to the plaintiff and the

Court of Claims affirmed the decision. *Neely v. United States,* 167 Ct.Cl. 407, 1964 WL 8619 (1964) ("*Neely II* ").

The government argues that the present case is distinguishable from *Neely* because in *Neely* a third party actually performed the contract at issue, whereas in the present case the lower court did not have evidence of any entity ever having engaged in AHELP lending. As far as the factual differences between *Neely* and this case are concerned, the government is correct. Where we disagree with the government is in our conclusion that *Neely* is not limited to circumstances where the contract has been performed by another party. We recently rejected an argument similar to the government's in *Cal Fed.* There, the Court of Federal Claims held that enactment of the Financial Institutions Reform, Recovery, and Enforcement Act, Pub.L. No. 101–73, 103 Stat. 183 (1989) ("FIRREA"), breached the government's promise to Cal Fed bank to allow a favorable accounting treatment in return for the acquisition of failing thrifts. Before trial, the court denied Cal Fed's claim for lost profits on summary judgment, concluding that profits would be too speculative as a matter of law. 43 Fed. Cl. 445, 458 (1999). The court distinguished *Neely* by noting that, in *Neely,* another party actually performed the contract which thereby provided "such precise information [as to] permit[ ] a determination of damages through simple mathematical calculations." *Id.* The court also distinguished *Chain Belt,* which was relied upon by Cal Fed. The court stated that, in *Chain Belt,* there was "detailed damages information available to the court [that was] striking by comparison" to the evidence before the court in *Cal Fed,* 43 Fed. Cl. at 459.

We vacated the summary judgment and remanded for trial on the issue of lost profits, holding that the lower court had erred in ruling at the summary judgment stage that proof of lost profits would be too speculative. We stated: "Both the existence of lost profits and their quantum are factual matters that should not be decided on a motion for summary judgment if material facts are in dispute." *Cal Fed,* 245 F.3d at 1350. We noted that "Cal Fed submitted considerable evidence, including documents and expert testimony, that more than sufficed to create a genuine issue of material fact as to the existence and quantum of lost profits." *Id.* We concluded that " '[i]f a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery.' " *Id.* (quoting *Locke v. United States,* 283 F.2d 521, 524, 151 Ct. Cl. 262 (1960)).

The government argues that *Cal Fed* is distinguishable from the present case because it did not involve a "new venture." The government reiterates its position that because AHELP was a new venture and because no evidence was presented of historical performance of a type of business similar to AHELP, it is impossible to measure lost profits with reasonable certainty.

We do not agree that lost profits should be precluded as a matter of law for new ventures that have not previously been performed by a third party. Whether or not one considers AHELP to have been a "new venture" or merely an extension of Energy Capital's existing loan business, Energy Capital was required to demonstrate its entitlement to lost profits by showing the same elements that any business must show: (1) causation, (2) foreseeability, and (3) reasonable certainty. *See Chain Belt,* 115 F.Supp. at 714, 127 Ct.Cl. at 58. While the nature of a new venture may make it difficult to recover lost profits

by establishing all of the elements of the general rule, such damages are not barred as a matter of law. This is consistent with the weight of modern authority, as explained in Robert L. Dunn, *Recovery of Damages for Lost Profits* § 4.3 (5th ed.1998):

> Most recent cases reject the once generally accepted rule that lost profits damages for a new business are not recoverable. The development of the law has been to find damages for lost profits of an unestablished business recoverable when they can be adequately proved with reasonable certainty.... What was once a rule of law has been converted into a rule of evidence.

*Id.* In a similar vein, the Seventh Circuit has quoted approvingly the following statement by the Alabama Supreme Court:

> [T]he weight of modern authority does not predicate recovery of lost profits upon the artificial categorization of a business as "unestablished," "existing," or "new" particularly where the defendant itself has wrongfully prevented the business from coming into existence and generating a track record of profits. Instead the courts focus on whether the plaintiff has adduced evidence that provides a basis from which the jury could with "reasonable certainty" calculate the amount of lost profits.... [T]he risk of uncertainty must fall on the defendant whose wrongful conduct caused the damages.

*Mid–America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1366 (7th Cir. 1996) (quoting *Super Valu Stores, Inc. v. Peterson*, 506 So.2d 317, 327–30 (Ala. 1987)); *see also DSC Communics. Corp. v. Next Level Communics.*, 107 F.3d 322, 329–30 (5th Cir.1997) (affirming award of profits based on expert testimony regard-

ing projected sales of "revolutionary new product" yet to enter market); *In re Merritt Logan, Inc.*, 901 F.2d 349, 357–59 (3rd Cir.1990) (affirming award of profits for new venture, based on plaintiff's contemporaneous projections of expected sales and expert testimony that forecasts were reasonable); *Computer Sys. Eng'g, Inc. v. Qantel Corp.*, 740 F.2d 59, 67 (1st Cir.1984) (affirming award of profits to new business based on expert testimony).

The cases cited by the government do not stand for the proposition that a *per se* bar exists for lost profits for new ventures. Rather, they simply represent instances in which the claimant failed, as an evidentiary matter, to establish entitlement to such profits. *See L'Enfant Plaza Properties, Inc. v. United States*, 3 Cl.Ct. 582, 590–91 (1983) (finding that the evidence was insufficient to show all three prongs of reasonable certainty, causation, and foreseeability); *Northern Paiute Nation v. United States*, 9 Cl.Ct. 639, 646 (1986) (stating that "the problem of speculation is insurmountable"); *see also Bluebonnet Savings Bank, F.S.B. v. United States*, 266 F.3d 1348, 1358 (Fed.Cir.2001) (affirming the Court of Federal Claims' decision not to award lost profits because "the evidence was insufficient to determine the quantum of . . . damages to a reasonable certainty.")

Similarly, the cases cited by the government from other circuits also do not establish a *per se* bar to lost profits for new ventures, but merely recite the presumptive rule that lost profits are difficult to establish for new ventures. *See Computrol, Inc. v. Newtrend, L.P.*, 203 F.3d 1064 (8th Cir.2000) (affirming the district court's post-trial ruling denying lost profits damages to the plaintiff because (i) a limitation of liability clause in the contract precluded recovery of lost profits; and (ii)

evidence of lost profits presented was unduly speculative); *Scheduled Airlines Traffic Offices, Inc. v. Objective, Inc.*, 180 F.3d 583, 588 (4th Cir.1999) (affirming the district court's judgment as a matter of law denying lost profits damages to the plaintiff because there was no evidence by which to estimate damages); *Hollywood Fantasy Corp. v. Gabor*, 151 F.3d 203, 213 (5th Cir.1998) (holding that a jury verdict awarding lost profits as damages was not supported by substantial evidence, because "there was no evidence at trial that [plaintiff] had 'firm' reasons to expect a profit.")

■ In this case, the Court of Federal Claims properly recognized that while the evidentiary hurdles to recovering lost profits for a new venture are high, such profits may be recovered if the hurdles are overcome. Because the court found as a matter of fact that Energy Capital had established causation, foreseeability, and reasonable certainty, and because the government does not challenge the court's findings of fact, we will not disturb the court's holding that Energy Capital is entitled to recover lost profits.

### B. Whether Energy Capital Showed That It Would Have Realized Profits From The AHELP Venture

The government further argues that the Court of Federal Claims erred as a matter of law by engaging in "rampant" and "unsupported" speculation in arriving at its determination that Energy Capital would have realized profits from the AHELP venture. The government contends that speculative expectancy damages may not be awarded against the United States, citing *Wells Fargo Bank N.A. v. United States*, 88 F.3d 1012, 1021 (Fed.Cir.1996) ("remote and consequential damages are not recoverable in a common-law suit for breach of contract ... especially ... in suits against the United States for the recovery of common-law damages.").

The government asserts that, before Energy Capital could have closed an AHELP loan, a number of steps would have had to have been completed and a number of parties (e.g. HUD, the first mortgagees, and property owners) all would have had to agree to the transaction. The government thus argues that the trial court's prediction that each of these steps would have occurred amounted to a level of speculation that was erroneous as a matter of law.

We do not agree that the Energy Capital's lost profits were overly remote and speculative as a matter of law. According to *Wells Fargo*,

> [i]f the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement.... But if they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit.

88 F.3d 1012, 1022–23 (Fed.Cir.1996) (quoting *Ramsey v. United States*, 101 F.Supp. 353, 121 Ct.Cl. 426 (1951)).

In the present case, Energy Capital's anticipated profits flowed directly from the AHELP agreement and not from "other independent and collateral undertakings."

As the Court of Federal Claims found, the express purpose of the AHELP agreement was to permit Energy Capital to make up to $200 million worth of loans to HUD-assisted property owners. *Energy Capital*, 47 Fed. Cl. at 385. When the government breached the AHELP agreement, Energy Capital was no longer able to issue those loans, and its resulting loss of profits flowed directly from the government's breach. *See Cal Fed*, 245 F.3d at 1349 (distinguishing *Wells Fargo* by pointing out that the government's promise to provide favorable regulatory treatment to Cal Fed was "a central focus of the contract and the subject of the government's breach," and stating that "profits on the use of the subject of the contract itself, here supervisory goodwill as regulatory capital [were] recoverable as damages.").

To the extent that a decision to award lost profits could be so remote and speculative as to be incorrect as a matter of law, we do not have such a case here. What we have before us is a case in which the trial court drew reasonable inferences based upon the evidence, not a case in which the trial court engaged in unsupported speculation. *See Locke v. United States*, 283 F.2d 521, 524, 151 Ct.Cl. 262, 267–68 (1960) ("Certainty [of damages] is sufficient if the evidence adduced enables the court to make a fair and reasonable approximation of the damages. In circumstances such as these we may act upon probable and inferential as well as direct and positive proof." (citations omitted)).

When asked at oral argument to name the most egregious example of speculation by the Court of Federal Claims, counsel for the government cited the issue of first mortgagee consent. Counsel pointed out that (i) Energy Capital presented no testimony from first mortgagees; (ii) Fannie Mae never consented to any AHELP loans in its capacity as first mortgagee—Fannie Mae had simply agreed to provide the funding for the AHELP loans; (iii) the government's expert, David Hisey, testified that virtually none of the first mortgagees would consent to participate in the AHELP program; and (iv) Energy Capital's testifying expert had a financial stake in the AHELP program.

Counsel's argument seems to be an indirect attack on the sufficiency of the evidence, rather than a legal argument. In any event, we conclude that the Court of Federal Claims drew reasonable inferences based on all of the evidence—discussed at length above—to arrive at its finding that 66 percent of first mortgagees would have consented to AHELP loans. The trial court also reasonably inferred that if Fannie Mae had agreed to fund AHELP, it also would have consented to allow AHELP loans on those properties for which it was first mortgagee.

■ As for the consent of the non-Fannie Mae first mortgagees, the Court of Federal Claims took into account the various incentives and disincentives to consent, including the fees that Energy Capital was willing to pay to first mortgagees to purchase their consent. Although Energy Capital failed to provide any witnesses from first mortgagees, it did present the testimony of David Smith, who was intimately familiar with the properties in the HUD portfolio. As for the relative weight given to the testimony of both sides' expert witnesses, we accord the trial court broad discretion in determining credibility because the court saw the witnesses and heard their testimony. *See Commercial Contractors, Inc. v. United States*, 154 F.3d 1357, 1369 (Fed.Cir.1998).

■ For the above reasons, we do not find the trial court's finding that 66 per-

cent of first mortgagees would have consented to AHELP loans to be clearly erroneous. Nor do we find the court's overall determination that Energy Capital was entitled to lost profits to be speculative as a matter of law.

## C. The Computation of Damages

Finally, the government contends that the Court of Federal Claims made the following two errors when it discounted the damages award: (i) discounting damages to the date of judgment instead of the date of breach of contract; and (ii) using a risk-free discount rate rather than a risk-adjusted discount rate.

### (i) *Date of Discounting*

The government argues that by discounting to the date of judgment, the trial court effectively awarded prejudgment interest against the United States—a practice which is prohibited by *Library of Congress v. Shaw,* 478 U.S. 310, 314, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986), unless there has been an explicit waiver of sovereign immunity. We disagree.

 "The time when performance should have taken place is the time as of which damages are measured." *Reynolds v. United States,* 158 F.Supp. 719, 725, 141 Ct.Cl. 211, 220 (1958). In many cases, the appropriate date for calculation of damages is the date of breach. *See Estate of Berg v. United States,* 687 F.2d 377, 380, 231 Ct.Cl. 466, 469 (1982). That rule does not apply, however, to anticipated profits or to other expectancy damages that, absent the breach, would have accrued on an ongoing basis over the course of the contract. In those circumstances, damages are measured throughout the course of the contract. To prevent unjust enrichment of the plaintiff, the damages that would have arisen after the date of judgment ("future lost profits") must be discounted to the date of judgment. *See Northern Helex Co. v. United States,* 634 F.2d 557, 564, 225 Ct.Cl. 194, 205 (1980) (discounting anticipated profits to the date of judgment). Discounting future lost profits to the date of judgment merely converts future dollars to an equivalent amount in present dollars at the date of judgment; it is not an award of prejudgment interest and does not violate sovereign immunity.

 Almost all of Energy Capital's lost profits would have been earned after the date of judgment. *Energy Capital,* 47 Fed. Cl. at 417 n. 42. Accordingly, we hold that the trial court did not err in discounting Energy Capital's lost profits to the date of judgment instead of the date of breach.

### (ii) *Discounting for Risk*

The government also argues that the trial court incorrectly applied a risk-free discount rate of 5.9 percent, the rate of return on 10–year Treasury notes with constant maturity. The government contends that the discount rate represents the return an investor would require in order to risk investing capital in a particular venture and that such a rate must incorporate any risk that cash flows would not be realized.

Before deciding this issue, we review the pertinent evidence presented at trial. Energy Capital retained an expert, Jerry Arcy, to calculate the damages suffered by Energy Capital as a result of HUD's termination of the AHELP agreement. At the time of trial, Mr. Arcy was a partner with the accounting firm of Price Waterhouse Coopers, where he was in charge of

corporate finance and corporate value consulting for all financial service entities in North America. Mr. Arcy testified based upon his experience in the valuation of cash flows relating to various types of mortgage instruments and portfolios of loans.

Mr. Arcy prepared an expert report and testified at trial about the value of the AHELP venture prior to the breach. To calculate this value, he used what is referred to as the "discounted cash flow" ("DCF") method. The DCF method is currently in wide use in the analysis of capital stock, acquisition candidates, capital projects, financial instruments, and contract rights. The DCF method measures the value of a business by forecasting its anticipated net cash flows. Such cash flows are then discounted to present value to account for both: (i) the time value of money; and (ii) business and financial risks.

In applying the DCF method, Mr. Arcy began by calculating that the AHELP venture would have produced $24.6 million in profits absent the breach. Mr. Arcy then discounted the $24.6 million amount to present value using a risk-adjusted discount rate. He determined that the most appropriate risk-adjusted discount rate was based on the average rate of return on mortgage real estate investment trusts ("REITs"). An REIT is a legal entity recognized by the Internal Revenue Code. A mortgage REIT is a REIT that chooses to own mortgage interests in real estate, as opposed to owning the encumbered real estate itself.

Mr. Arcy relied on mortgage REITs because a mortgage REIT would be interested in acquiring AHELP loans. During the appropriate time, the average dividend yield (i.e. the rate of return) for mortgage REITs was approximately 8.5 percent. Mr. Arcy then added 2 percent to that rate in order to account for the debt component and profit component, thereby arriving at a risk-adjusted discount rate of 10.5 percent.[6]

The government presented its own accounting expert, David Hisey, who also testified regarding the value of the AHELP venture prior to the breach. Mr. Hisey agreed with Mr. Arcy that a risk-adjusted discount rate was appropriate, but opined that a higher risk-adjusted discount rate of 25% should be used. Mr. Hisey considered the AHELP Program to be a form of specialized lending. Mr. Hisey, accordingly, averaged the returns of five specialized lending companies.

In post-trial briefing, Energy Capital backed away from a portion of the valuation method used by its own expert, Mr. Arcy. Specifically, Energy Capital objected to the use of a risk-adjusted discount rate; Energy Capital argued instead that *LaSalle Talman Bank v. United States,* 45 Fed. Cl. 64, 109 n. 69 (1999), mandates the use of a risk-free rate of return, which *LaSalle* suggests is the current rate of interest on Treasury securities.[7] *See Energy Capital,* 47 Fed. Cl. at 417.

**6.** Mr. Arcy testified that the DCF method calculates the present value of a venture that is anticipated to produce a stream of profits by using a risk-adjusted discount rate. The risk-adjusted discount rate represents the rate of return that an investor would require in order to purchase the venture (i.e. purchase the stream of anticipated profits), considering the riskiness of the venture. The higher the risk, the higher the rate of return an investor would require.

**7.** The lower the discount rate used, the higher the present value of the damages award. It was therefore in Energy Capital's interest to advocate as low a discount rate as possible.

The Court of Federal Claims, relying on *Northern Helex*, 634 F.2d at 564, agreed with Energy Capital that the appropriate discount rate was the rate of return on "conservative investment instruments." *Energy Capital*, 47 Fed. Cl. at 418. The court thereby took judicial notice of the rate of return on 10–year Treasury notes with constant maturity on the date of judgment (5.9%) and discounted the damages award to present value using this conservative discount rate. The court also stated, however:

> Notwithstanding *Northern Helex[ ]*, the Defendant presents a cogent argument for why the discount rate should consider the riskiness of the endeavor. Undoubtedly, the Defendant will present its argument to the Federal Circuit, a court with the authority to overrule *Northern Helex[ ]*.
>
> The Federal Circuit may determine that, as a matter of law, trial courts should consider the riskiness of the project in establishing the discount rate. The Defendant cites *In re Lambert*, 194 F.3d 679, 681 (5th Cir.1999); *Douglass v. Hustler Magazine, Inc.*, 769 F.2d 1128, 1143 (7th Cir.1985); and *Schonfeld v. Hilliard*, 62 F.Supp.2d 1062, 1074 n. 6 (S.D.N.Y.1999), all cases where the discount rate was affected by the risks. This Court believes that the assessment of the riskiness of the investment is a question of fact. Hence, the Court will make findings of fact related to this issue. These findings, however, are useful only if the Federal Circuit holds that the discount rate is something other than the rate on conservative investment instruments.

*Id.*

The court proceeded to make alternative findings of fact as to an appropriate risk-adjusted discount rate. The court found that, If the discount rate should reflect the riskiness of the AHELP venture, then the discount rate should be 10.5 percent, the rate proposed by Energy Capital's expert, Mr. Arcy. *Id.* The court expressly rejected the discount rate (25 percent) offered by the government's expert, Mr. Hisey, because it found his methodology "far from credible." *Id.* We hold that Mr. Arcy's proposed risk-adjusted discount rate of 10.5 percent is the appropriate discount rate to be used in this case.

 The appropriate discount rate is a question of fact. *See, e.g.*, Robert L. Dunn, *Recovery of Damages for Lost Profits* § 6.25 (5th ed. 1998) ("The applicable discount rate is a fact question that should be raised."); *Monessen Southwestern Railway Co. v. Morgan*, 486 U.S. 330, 341, 108 S.Ct. 1837, 100 L.Ed.2d 349 (1988) (holding that when discounting an injured employee's award under the Federal Employers' Liability Act, "the present value calculation is to be made by the 'trier of fact'"); *Olson v. Nieman's, Ltd.*, 579 N.W.2d 299 (Iowa 1998) (discount rate of 19.4% approved for future hypothetical patent royalties based on expert's testimony as to 14.4% rate of return for publicly-held corporations plus 5% for market risk); Robert L. Dunn and Everett P. Harry, *Modeling and Discounting Future Damages*, 193 J. Acct 49, 51 (Jan.2002) (discussed in footnote 9 below).

The purpose of the lost profits damages calculation is to put Energy Capital "in as good a position as [it] would have been in had the contract been performed." Restatement (Second) of Contracts § 344(a). To arrive at the appropriate damages figure, both sides presented expert certified public accountant witnesses who calculated the value of the AHELP venture prior to

the breach. Both experts had a great deal of experience in valuing mortgage portfolios, and neither expert advocated using a risk-free discount rate. Both experts advocated using risk-adjusted discount rates, albeit different ones.

Energy Capital argues that once the Court of Federal Claims determined that its profits were reasonably certain, no further consideration of risk was appropriate, because risk already had been considered in determining whether there would have been profits. We disagree. A venture that is anticipated to produce $1 million in profits and that has a 95% chance of success is obviously more valuable than a venture that is anticipated to produce $1 million in profits with only a 90% chance of success—and yet, both ventures would most likely be determined to have a reasonable certainty of producing profits. Therefore, the fact that the trial court has determined that profits were reasonably certain does not mean that risk should play no role in valuing the stream of anticipated profits. In other words, by finding that Energy Capital's lost profits were reasonably certain, the trial court determined that the probability that the AHELP venture would be successful was high enough that a determination of profits would not be unduly speculative. The determination of the amount of those profits, however, could still be affected by the level of riskiness inherent in the venture.[8]

Energy Capital argues that the sole purpose in discounting is to account for the time value of money. Again, we disagree. When calculating the value of an anticipated cash flow stream pursuant to the DCF method, the discount rate performs two functions: (i) it accounts for the time value of money; and (ii) it adjusts the value of the cash flow stream to account for risk. *See* Richard A. Brealey and Steward C. Myers, *Principles of Corporate Finance*, p. 244 (6th ed.2000) (explaining that when valuing an anticipated cash flow, "if the cash flow is risky, the normal procedure is to discount its forecasted (expected) value at a risk-adjusted discount rate.... The risk-adjusted discount rate adjusts for both time and risk.")

We do not hold that in every case a risk-adjusted discount rate is required. Rather, we merely hold that the appropriate discount rate is a question of fact. In a case where lost profits have been awarded, each party may present evidence regarding the value of those profits, including an appropriate discount rate.

*Northern Helex* did not mandate that a conservative discount rate is always required as a matter of law when calculating lost profits. In *Northern Helex*, the Court of Claims rejected the methodology used by the Trial Judge in calculating a lost profits damages award. After correcting the Trial Judge's methodology, the court arrived at a new figure for lost profits and then discounted to present value using "conservative investment instruments." 634 F.2d at 564. Significantly, the court made no mention of any evidence presented at trial pertaining to a risk-adjusted discount rate. When there is no evidence

---

8. When the Court of Federal Claims determined the amount of Energy Capital's lost profits, it inherently accounted for a number of risks, such as the risk that not all first mortgagees and property owners would consent to the AHELP agreement. However, other risks were not accounted for by the court, such as the risk that borrowers would default on their AHELP loans. Even though Energy Capital itself was not going to provide funding for AHELP loans, its profits still would have been reduced by any defaults on the part of property owners. That is because its profits were dependent on receiving a percentage of the stream of loan payments from the owners.

in the record pertaining to the discount rate to be used when discounting a damages award, it certainly is appropriate for a court to apply a risk-free conservative discount rate to discount a damages award to present value. That does not mean, however, that a conservative discount rate is legally mandated in every case.[9]

▮ In a given case, it is for the factfinder to determine the method of adjusting for risk which most closely represents the value of damages. In the case before us, both parties presented CPA experts who agreed that a risk-adjusted discount rate was appropriate. Neither expert suggested that using a risk-free discount rate would accurately represent the value of the AHELP venture. Because the trial court found that Mr. Arcy's discount rate was more credible, we hold that 10.5% is the appropriate discount rate in this case.

## CONCLUSION

The Court of Federal Claims did not err in awarding Energy Capital lost profits from the AHELP venture. Neither did the court err in reducing the award to present value as of the date of judgment. In those respects, the decision of the Court of Federal Claims is affirmed. We do conclude, however, that in the circumstances of this case, the present value of

the damages award should have been calculated using a risk-adjusted discount rate. In that limited respect, the court's decision is reversed. The case is remanded to the Court of Federal Claims for determination of a final damages award based upon the risk-adjusted discount rate of 10.5 percent found in the alternative by the court. Accordingly, the court's decision is affirmed-in-part, reversed-in-part, and remanded.

*AFFIRMED–IN–PART, REVERSED–IN–PART and REMANDED.*

---

9. There are other situations where a risk-free discount rate may also be appropriate. For example, in some cases the calculation of the anticipated stream of lost profits may be adjusted for risk prior to discounting. As explained in Robert L. Dunn and Everett P. Harry, *Modeling and Discounting Future Damages*, 193 J. Acct 49 (Jan.2002): "CPA expert witnesses frequently testify in court about damages assessments when a plaintiff alleges future economic losses because of a defendant's wrongdoing." The Dunn and Harry article then explains that there are two methods typically used by CPA experts to account for risk when calculating the value of a stream of anticipated profits. According to the first method, the CPA expert (i) estimates the plaintiff's hoped-for income stream (i.e.

the anticipated profits); (ii) reduces the value of the hoped-for income stream to account for risks; and (iii) discounts the risk-adjusted income stream to present value using a conservative (relatively low) discount rate. According to the second method, the CPA expert (i) estimates the plaintiff's hoped-for income stream; and (ii) discounts the value of the hoped-for income stream using a risk-adjusted (higher) discount rate. The authors of the article prefer the first method because, according to the authors, it is "easier for judges and juries to understand," and it produces a more accurate damages value when there is a short, finite damages period. *Id.* at 49.