**Stanley K. MANN, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 98–312C.

United States Court of Federal Claims.

Filed April 9, 2009.

Reissued April 14, 2009.*

* This opinion is reissued for publication with some minor corrections. These corrections do not affect the judgment which has been entered in this case.

Steven J. Lechner, Mountain States Legal Foundation, Lakewood, Colo., for plaintiff. William Perry Pendley, Mountain States Legal Foundation, Lakewood, Colo., of counsel.

Roger A. Hipp, Commercial Litigation Branch, Civil Division, Department of Jus-

tice, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director, all of Washington, D.C., for defendant.

### OPINION AND ORDER

WOLSKI, Judge.

Plaintiff Stanley K. Mann seeks damages for the government's breach of a geothermal lease. The Federal Circuit has previously determined that the United States Department of Interior's Bureau of Land Management ("BLM") breached Mr. Mann's lease by failing to provide him with notice that the lease would be terminated unless he provided satisfactory evidence of diligent efforts to utilize the lease's geothermal resources. *Mann v. United States*, 334 F.3d 1048, 1052 (Fed.Cir.2003). The Bureau's "Lease Determination" was instead sent by certified mail to the wrong address, and returned as "unclaimed" nearly a month later, *id.* at 1050, but BLM nevertheless determined that constructive notice was given, and terminated the lease. By the time Mr. Mann received notice of the Lease Determination, during a visit to a BLM office on August 16, 1995, the lease had been terminated for over eighteen months, and plaintiff was never given the opportunity to demonstrate the diligent efforts he had exerted to market the geothermal resource. *See id.* After the Federal Circuit found that the terms of Mr. Mann's lease agreement had been breached, a trial on damages was held. As is described in detail below, the Court has found that plaintiff is entitled to damages totaling $869,501.52.

### I. BACKGROUND

This case concerns geothermal lease NM 40957, issued by BLM with an effective date of November 1, 1981. JX 1. This lease granted the lessee "the exclusive right and privilege to drill for, extract, produce, re-move, utilize, sell, and dispose of geothermal steam and associated geothermal resources" which were located in or under certain federal land in Dona Ana County, New Mexico. *Id.* The leased area consisted of more than 1,900 acres of land, just outside Las Cruces, New Mexico, including most of Tortugas Mountain. *See id.;* PX 45. The lease was initially issued to Southland Royalty Company, *see* JX 1, which in turn immediately assigned it to Chaffee Geothermal, Ltd. ("Chaffee"). PX 5. At the time of issuance, the leased area was not deemed to be in a known geothermal resources area ("KGRA"). PX 3.

The Geothermal Steam Act of 1970 authorizes the Secretary of the Interior to issue leases for the development and utilization of geothermal steam resources on lands administered by the Secretary. 30 U.S.C. §§ 1001–25 (2000).[1] The Act also specifies minimum rents and royalties for geothermal leases. 30 U.S.C. § 1004 (2000). Under the Act, competitive bidding was not required unless the lands to be leased were within a KGRA. *See* 30 U.S.C. § 1003 (2000). Leases were issued for a primary term of ten years, and if geothermal steam resources were "produced or utilized in commercial quantities within [the primary] term," the lease would continue beyond the primary term for up to forty years provided that the resources continued to be "produced or utilized in commercial quantities." 30 U.S.C. § 1005(a) (2000). For these purposes, "produced or utilized in commercial quantities" was defined by Congress to "include the completion of a well capable of producing geothermal steam in commercial quantities so long as the Secretary determines that diligent efforts are being made toward the utilization of the geothermal steam." 30 U.S.C. § 1005(d) (2000).[2]

Chaffee drilled three production wells on the leased land, which were identified based on the column and row in which they fell in the grid for the corresponding Public Land Survey System section. *See* Trial Tr. ("Tr.")

---

1. All references are to the Geothermal Steam Act provisions in effect during the duration of plaintiff's lease, unless stated otherwise. The Act was subsequently amended in August, 2005. *See* Energy Policy Act of 2005, Pub.L. No. 109–58, 119 Stat. 594 (2005).

2. This definition is now found at 30 U.S.C. § 1005(h).

at 43; JX 14 at 6, 13; PX 45. Drilling for the first two wells began in November 1981 and ran through January 1982. JX 14 at 6; Tr. at 44. The first, well 35–25, was drilled to a depth of 950 feet and discovered several production zones of hot water reaching a maximum temperature of 154.4 degrees Fahrenheit. Tr. at 35; JX 14 at 6–7. The well, however, was lost during the cementing process. JX 14 at 7; Tr. at 37–38. The second well, well 12–24, was drilled to a depth of 1,315 feet. JX 14 at 8; Tr. at 46–47. Well 12–24 found water at a temperature of about 150 degrees Fahrenheit, and a production zone estimated to be capable of producing between 1,750 and 3,000 gallons of water per minute. JX 14 at 8; Tr. at 46–48. The third well, well 55–25, was drilled in October and November 1982. JX 14 at 14; Tr. at 57. Chaffee drilled this well to a depth of 2,645 feet, discovered water with an observed temperature of 155 degrees Fahrenheit, and found at least one significant production zone capable of producing an estimated water flow of at least 2,500 gallons per minute. JX 14 at 14–16; Tr. at 59, 69. Although the plan was to drill well 55–25 to a depth of 3,000 feet, Chaffee's investors decided to stop the drilling short of that mark. Tr. at 57–58, 160–61.

Shortly thereafter, its investors decided to provide no more funding for the company, and the employees of Chaffee were laid off in February 1983. Tr. at 161–63. Mister Mann, the chief executive officer ("CEO") of Chaffee, moved its operations to the basement of his house, and continued its work with the assistance of two other officers. Tr. at 163–64. The three officers believed that the investors had breached an agreement to finance $4.5 million in total operations, including their employment contracts, and they incurred debts to keep Chaffee running. Tr. at 163–66, 171, 176–77. Ultimately, the other two officers assigned Mr. Mann their claims against the investors in order to be released from liability for Chaffee's debts, and Mr. Mann negotiated a December 1985 settlement with the investors under which he received the rights to Chaffee's geothermal leases. See PX 76; PX 80; Tr. at 187, 190–

91, 213. Lease NM 40957 was assigned to Mr. Mann on December 20, 1985, see JX 2 at 1–2, and the assignment was approved by BLM effective April 1, 1986. Id. at 3; Tr. at 195–96.

## A. Prior Proceedings

After Mr. Mann was belatedly informed of the termination of his lease, he unsuccessfully appealed the termination before the Interior Board of Land Appeals ("IBLA"). See Mann v. United States, 53 Fed.Cl. 562, 564 (2002) ("Mann I"). He filed a complaint in a federal district court seeking review of IBLA's decision under the Administrative Procedure Act, 5 U.S.C. §§ 702, 706, but voluntarily dismissed that action to pursue his claims before our Court. Id. The complaint in this case was filed on April 2, 1998, and contained a claim for breach of contract and two claims under the Fifth Amendment—alleging the taking of private property without payment of just compensation, and the deprivation of property without due process of law.[3]

This Court granted the government's motion to dismiss the due process claim for lack of subject matter jurisdiction, granted the government's motion for summary judgment on the breach of contract claim, and denied plaintiff's cross motion for judgment as to liability. Mann I, 53 Fed.Cl. at 569–70. The Federal Circuit reversed the judgment relating to the breach of contract claim, holding that the government improperly terminated the lease by not giving Mr. Mann the required notice. Mann v. United States, 334 F.3d 1048, 1052 (Fed.Cir.2003) ("Mann II"). Thus, the government has been judged liable for breach of the lease. Id.

The Federal Circuit remanded the matter back to this Court, where it was re-assigned to the undersigned. The government then moved for partial summary judgment as to damages, arguing that lost profits based on commercial use of the geothermal resources, and restitution based on Chaffee's expenditures, are not available remedies. Mann v. United States, 68 Fed.Cl. 666, 668 (2005) ("Mann III"). This motion was denied. Id.

---

**3.** The takings claim was dropped by plaintiff. See Mann I, 53 Fed.Cl. at 563 n. 1.

at 671–72. The Court determined that profits from the sale of the geothermal energy were not based on a collateral undertaking, but instead directly related to the subject of the contract. *Id.* at 669–70 (citing, *inter alia, Wells Fargo Bank, N.A. v. United States,* 88 F.3d 1012, 1023 (Fed.Cir.1996); *Neely v. United States,* 152 Ct.Cl. 137, 142, 285 F.2d 438 (1961); and *Energy Capital Corp. v. United States,* 302 F.3d 1314, 1328–29 (Fed.Cir.2002)). The Court found that the law did not preclude plaintiff from recovering lost profits merely because a third party had not performed the business undertaking upon which the profits are based. *Id.* at 670 (citing *Energy Capital,* 302 F.3d at 1326). And the Court held that restitution damages could be awarded based on the benefit conferred upon the government by Chaffee, Mr. Mann's assignor. *Id.* at 671–72 (citing, *inter alia, Mobil Oil Explor'n & Prod. Southeast, Inc. v. United States,* 530 U.S. 604, 608, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000); *Landmark Land Co. v. FDIC,* 256 F.3d 1365, 1369, 1372 (Fed.Cir.2001)).

**B.  The Trial**

A three-day trial on damages was held in Las Cruces, New Mexico. Six witnesses testified for the plaintiff, including Mr. Mann himself, Tr. at 127–237, 245–324; a former Chaffee employee who was qualified as an expert in geology and hydrogeology, including geothermal resources, *see* Tr. at 16 (qualifying Mr. Gross); and an expert in geothermal energy and its use by businesses. *See* Tr. at 480 (qualifying Mr. Whittier). The government called two witnesses, one of whom was an expert in geothermal energy. *See* Tr. at 740–41 (qualifying Mr. Lane). Plaintiff introduced into evidence over sixty exhibits, defendant introduced three, and sixteen of the eighteen joint exhibits were used.

After trial, both parties filed thorough post-trial opening and reply briefs. *See* Pl.'s Post–Trial Opening Br. ("Pl.'s Br."); Def.'s Post–Trial Br. ("Def.'s Br."); Pl.'s Post–Trial Resp. Br. ("Pl.'s Reply"); Def.'s Reply Post–Trial Br. ("Def.'s Reply"). Mister Mann's

primary claim for damages is a request for lost profits, based in large part on expert testimony. *See* Pl.'s Br. at 13–33; Pl.'s Reply at 1–18. In the alternative, he requests reliance damages, based on the time and money he and a colleague invested in developing the lease, and on the claims he released in exchange for the lease. *See* Pl.'s Br. at 42–48; Pl.'s Reply at 18–27. Plaintiff's fall-back request is an award of restitution damages, based on the benefits received by the government in the exploration and development of the lease by Mr. Mann and his predecessors. *See* Pl.'s Br. at 48–51; Pl.'s Reply at 27–29. This opinion is issued after a careful consideration of the briefs, testimony and other evidence introduced at trial.

**C.  The Witnesses[4]**

*1.  James T. Gross*

Plaintiff's first witness was James T. Gross, a professional geologist who was retained to prepare an expert report on the exploration and development work performed on the NM 40957 lease. Tr. at 9, 14; *see also* JX 14 (Mr. Gross's report). Mister Gross has both a bachelor's and a master's degree in geology, and at the time of the trial had twenty-nine years' experience as a geologist. Tr. at 10. In April 1981 he was hired by Chaffee to serve as the senior geologist responsible for the exploration and development work of the company. Tr. at 22. In this position, he oversaw the drilling and testing of the three production wells on the leased lands, and was responsible for the logs recording the conditions encountered in the drilling, including water locations and temperatures. Tr. at 29–32, 60–61, 64–67; *see also* PX 104; PX 105.

Mister Gross confirmed that well 12–24 was completed and could produce 2,500 gallons of water per minute, at a temperature of 150 degrees Fahrenheit. Tr. at 49, 69; *see also* JX 14 at 7–8. Well 55–25 could produce 155 degree Fahrenheit water at perhaps 3,000 gallons per minute. Tr. at 59, 69; *see also* JX 14 at 15–16. Each well could indefinitely sustain a production rate of 1,757 gal-

---

**4.** This portion of the opinion contains findings of fact pursuant to Rule 52 of the Rules of the

lons per minute, without a drop in water temperature, and the wells should last more than thirty years given the low levels of total dissolved solids in the water. Tr. at 105–08; *see also* JX 14 at 19. Both wells were left in a ready state to be used again. Tr. at 70–71.

Mister Gross also reviewed the set of copies of 198 checks issued by Chaffee in 1981 and 1982 to pay for the exploration and development work on NM 40957. Tr. at 92–94; *see* PX 9 (letter to BLM with copies of checks attached). He was able to categorize the expenditures into five categories, Tr. at 94; *see* JX 14 at 17, confirmed that they were all direct costs of exploration and development, and opined that they were "reasonable and necessary" in order to develop the geothermal field beneath the leased lands. Tr. at 95–96; *see also* JX 14 at 19. Mister Gross believed that these expenses, totaling $854,521.15, undercounted the exploration and development costs, as he was aware of expenditures which were not included, such as his transportation and lodging costs. Tr. at 94–95. And based on his experience, he was of the opinion that Chaffee's exploration and development costs "were probably on the low side" for geothermal projects of that nature. Tr. at 120.

A rebuttal report was also submitted by Mr. Gross, responding to some of the statements in defendant's expert report. *See* JX 18; Tr. at 111–12. Among other things, he explained that the risks associated with drilling were primarily not depth of drilling but rather unknown geologic conditions, and that these risks were "immensely decreased" by the exploration that has been done. Tr. at 112–13; *see also* PX 18 at 1.

### 2. Stanley K. Mann

Mister Mann was practicing law in Boulder, Colorado in the late 1970s, with clients which included oil-and-gas companies, when he first came into contact with Jay Dick, the president and founder of Chaffee. Tr. at 134–36. He became Chaffee's counsel, Tr. at 137, and was asked by Mr. Dick to make a presentation to potential investors from New York, who were involved in the oil-and-gas industry. Tr. at 139–41. The potential investors—Gilbert Kerlin, Francis Goelet, Rob-

ert G. Goelet, and John L. Carroll, *see* Tr. at 139, 141, 151—agreed to invest $4.5 million in Chaffee's operations, provided that Mr. Mann agreed to become Chaffee's CEO. Tr. at 142. Mister Dick had no objection to this arrangement, and both he and Mr. Mann negotiated employment contracts with the investor group. Tr. at 142–43. Because the investors were asking for a seven-year option to purchase a 50% interest in Chaffee, Messrs. Mann and Dick requested seven-year employment contracts, and the investors agreed. *Id.* To entice Mr. Mann away from his relatively lucrative law practice, the investors agreed to pay him $100,000 annually, plus benefits which he estimated totaled another $20,000. Tr. at 142–43, 176; *see also* PX 93. According to Mr. Mann, Mr. Dick's contract paid him $65,000 annually. Tr. at 197. Mister Mann's employment package also apparently included a 15% stake in Chaffee. Tr. at 151.

Although he continued to work on Chaffee business while he wound up his legal practice, plaintiff did not officially start as Chaffee CEO until December 1, 1981. Tr. at 143–44. By that time he had worked closely with a consultant, Larry R. Hall, who served as a landman obtaining private leases and rights-of-way for Chaffee. Tr. at 144–45. To obtain the services of Mr. Hall and his employees on a regular basis, the investors authorized Chaffee to obtain Mr. Hall's company. Tr. at 150–54. Mister Hall was given an employment contract paying him $45,000 plus the $20,000 benefits package, which was to renew annually. Tr. at 176; *see also* Tr. at 342–43.

In November 1982, while the third production well was being drilled, word came from the investors to drill no further. Tr. at 161. It appeared that the investors, who also owned North Central Oil Corp., were experiencing financial difficulties due to the impact of the fall in oil prices on their other business. Tr. at 160–61. Within two months, the investors told Mr. Mann to lay off Chaffee's employees. Tr. at 163. By that point, the investors had, according to Mr. Dick's calculations, invested less than $1.64 million of the $4.5 million they had committed to Chaffee, with $1,473,338 of that spent on NM

40957. Tr. at 163, 165–66; *see* PX 89. Mister Mann, together with Messrs. Dick and Hall, continued to operate Chaffee, moving the business into the basement of Mr. Mann's house and personally borrowing funds to pay a few remaining employees and satisfy the company's creditors and vendors. Tr. at 163–64, 171–72.

Over the next three years, Mr. Mann and Chaffee worked at marketing the geothermal resources under NM 40957. He and Mr. Hall "intensely visited Las Cruces," trying to interest the city in the development of a geothermal industrial park. Tr. at 172. He apparently offered the NM 40957 lease to the city for $2.3 million. Tr. at 173. By July of either 1983 or 1984, Chaffee had executed a signed contract to sell the geothermal project to a company named "X7," allegedly for $1,733,000. Tr. at 173–74, 177. But the deal was called off by the owner of X7, two days before closing, because of family issues. Tr. at 173–74. Other prospective deals never made it to paper. Alexander Masson apparently agreed to locate a greenhouse in the proposed geothermal industrial park, were the city to approve the project, but the project did not pass the city council. Tr. at 179–80. A "handshake deal" with a Mexican company named "EPN," allegedly to invest $5 million into development of the resources, was scuttled by a devaluation of the peso. Tr. at 184–85, 313.

As first Mr. Dick, and then Mr. Hall, found they could no longer afford to remain involved with Chaffee, in return for Mr. Mann's assumption of the company's debts they assigned to plaintiff their employment contract claims against the investors. Tr. at 185–86; *see* PX 76. In December 1985 Mister Mann was able to settle the claims with the investors, releasing them from the employment contract claims that Mr. Mann estimated to exceed $1 million and the claims for other expenses, in return for $36,250 plus the rights to Chaffee's geothermal leases. Tr. at 187–91, 196–98; PX 80. Lease NM 40957 was then assigned to Mr. Mann, with BLM approval effective April 1, 1986. JX 2; Tr. at 195–96.

Mister Mann formed Crowne Geothermal Ltd. ("Crowne") as a vehicle to market the geothermal resources associated with NM 40957. *See* Tr. at 188–89. A few months after the lease assignment became effective, Mr. Mann wrote to BLM as president of Crowne, enclosing copies of the Chaffee checks that were issued in 1981 and 1982 to pay for exploration and drilling on the leased lands. PX 9; Tr. at 201–02. Plaintiff requested that these expenditures, totaling $854,521.52, be deemed to satisfy the diligent exploration requirements under the Geothermal Steam Act. PX 9 at 1. The Bureau approved the request, allocating $527,726.04 of the costs to lease year 1981–82, and $326,795.48 to lease year 1982–83. PX 10. In the approval letter, BLM explained that the expenditures "qualifie[d] as diligent exploration pursuant to 43 C.F.R. § 3203.5," as in effect at that time, and noted that wells 12–24 and 55–25 were "shut in and ready to produce." *Id.*

Before settling matters with the investors, in August 1985 Mr. Mann resumed the practice of law, sharing an office in downtown Denver with other attorneys. Tr. at 207–08. He claimed that his practice allowed him to spend the "vast majority" of his time working on marketing the lease. Tr. at 208. In January 1986, he discussed with Mr. Hall the possibility of designing a unique greenhouse that could use geothermal resources. Tr. at 208. For the next four years, Messrs. Mann and Hall "spent a lot of time devoted in that direction," with Mr. Hall developing the concept he dubbed the "Aquaveyor," and Mr. Mann working to interest greenhouse operators and attending meetings concerning the use of geothermal resources. Tr. at 208–10. But beginning in February 1986, Mr. Mann resumed the full-time practice of law, joining a firm at which he would stay until June 1989. Tr. at 210–11, 216, 269.

Although the passage of time understandably dulls some memories, Mr. Mann's attempts to account for his time spent developing the lease were rather vague. He stated he was "quite confident" that he "put 1,500 to 2,000 hours into this project" in 1986, and later, also with confidence, put this figure at 2,000 hours "at least." Tr. at 211, 268. For 1987, because of the increasing demands of his law practice, this number dropped to

"probably 1,000 hours." Tr. at 269; *see also* Tr. at 211. He explained that these were "mostly nights and weekends," and the only specificity he provided concerned a daily hour of lunch with Mr. Hall, during which they "review[ed] where we were and what we had done the night before and what we were going to do the coming weekend and that kind of thing." Tr. at 211, 269. For 1988, Mr. Mann first stated that he worked 500 to 1,000 hours on the lease, including travel to conferences to maintain his reputation and contacts, but later put this figure at 1,000 hours. Tr. at 211–12, 269. He remembered visits to greenhouses in San Francisco and Carpinteria, California, as well as trips to Phoenix, Michigan, and Kansas City. Tr. at 212. Mister Mann also paid for some of Mr. Hall's travels, primarily to Las Cruces to work on the application for a use permit. *Id.; see also* PX 15 (February 1988 application to the BLM for a well production utilization permit). No documentation of any of Mr. Mann's trips, or his reimbursements to Mr. Hall, was introduced into evidence.

In June 1989 Mr. Mann left his law firm and prepared for a career move into academia, as he moved to California to begin teaching business and real estate law classes at Pepperdine University's business school. Tr. at 217–18, 269. For 1989, he claimed to have worked "around 15 to 20 hours a week" on the lease while with the law firm, Tr. at 216, and worked on the lease through the summer while between jobs, totaling 1,000 hours. Tr. at 269. While at Pepperdine University, he claims he spent 2,000 hours working on the lease from August 1989 through August 1990, and another 2,000 hours through August 1991. Tr. at 270–71. He then spent a school year abroad in Germany establishing Pepperdine's international business program, which allowed him to spend allegedly 200 hours working on the lease. Tr. at 221, 271. He returned to the California campus in August 1992, and from that point until he learned of the lease termination in August 1995, he claims to have spent 2,000 hours working on the lease each year. Tr. at 271.

Mister Mann explained that teaching did not pose many demands on his time, as he taught for eight hours each week, and had only two to four hours' of faculty meetings each month. Tr. at 218, 272. But, again, his description of the work performed on the lease was vague, and little documentation was provided. He stated that he worked on business plans and financial analyses, called "people all the way from San Francisco to Las Cruces," and had many meeting in Pasadena and Valles Caldera. Tr. at 272–73. He claimed to have flown frequently to Boulder, for meetings "with a venture capital concern." Tr. at 273. And he mentioned discussions with potential investors he met through his daughter's contacts, which began in 1990 and carried through into 1995. Tr. at 219–20. He stated that he saw one member of this group on at least a weekly basis after August 1992, as that person "taught in the same location" as Mr. Mann. Tr. at 277–78; *see also* Tr. at 220. Mister Mann believed he was close to an agreement with these investors, headed by Bruce Klumph, when he learned of the lease termination. Tr. at 277–78, 311–12. But although Mr. Mann referenced "something around 30 boxes of documents" produced by Mr. Hall and him during this time period, Tr. at 273, no documentation of his travels, expenses, or time spent was introduced into evidence, save for one business plan. *See* PX 55; Tr. at 231–32, 275, 286. He estimated that his travel and hotel expenses incurred in marketing the lease were "an average of $10,000 a year." Tr. at 274.

In August 1989, Mr. Mann sent a letter to BLM's Roswell, New Mexico district office, informing the office of the production capabilities of wells 12–24 and 55–25, and informing the BLM that he wished for the lease to be converted to a long-term one. PX 17; Tr. at 214–15. Enclosed with the letter was documentation concerning the two wells, including logs of the conditions encountered and testing results. *See* PX 17 at 34–36. In March 1990, BLM in response informed Mr. Mann that the Roswell office determined that well 12–24 was completed and that the minimum royalty, rather than a rental payment, would be charged for the lease. PX 21; Tr. at 228. And in September 1990, BLM sent Mr. Mann a letter informing him that his lease account was transferred to the "Royal-

ty Management Program," due to the Roswell BLM office's determination that he had "a well capable of production in paying quantities." PX 22; Tr. at 229–30. Mister Mann took these letters to indicate that his lease had been converted to a long-term one under the Geothermal Steam Act. Tr. at 228–30. Mister Mann's annual payments to BLM doubled, from $1,280 under the rental terms to $2,560 as a royalty payment. Tr. at 230, 233, 236; *see* PX 59 (royalty payments Oct. 1993–95), PX 73 (Oct.1985 rental payment). The annual premium for the required $10,000 bond for the lease remained at $100. *See* PX 60; PX 86; Tr. at 266–67.

After Mr. Hall had completed an initial version of his Aquaveyor greenhouse concept, he and Mr. Mann began the process for obtaining BLM's permission to locate greenhouse facilities on the leased land. *See* PX 15. The Bureau informed them that a drainage study and an approved water discharge plan were required, as well as "a high level environmental assessment." JX 9 at; *see* Tr. at 257–58, 301–02. As the lease involved lands that were withdrawn for use by the National Aeronautics and Space Administration ("NASA"), *see* JX 5, BLM requested and received NASA's concerns about the greenhouse proposal. These included a "grave concern" over transmission lines and an "unfavorabl[e]" view of increased dust due to traffic. JX 10 at 2. An employee of New Mexico State University ("NMSU"), which allegedly managed the withdrawn lands for NASA, also submitted a list of concerns to BLM. *See* JX 11 at Att. 1; Tr. at 304–07. Mister Mann convincingly explained that the reason that none of the concerns was resolved at the time was that Mr. Hall had developed a new version of the Aquaveyor concept, rendering their permit application, based on the old design, moot. Tr. at 307–08, 310–11.

Mister Hall had served as Vice President of Crowne. Tr. at 247; *see also* PX 38. According to Mr. Mann, Mr. Hall was also a shareholder in Crowne. Tr. at 247–48. Plaintiff testified that he had given Mr. Hall a 44% or 46% share of Crowne in return for his efforts in developing the Aquaveyor system, and that the NM 40957 lease was held in trust for Crowne. *Id.* As Mr. Mann relates it, after the lease was terminated, Mr. Hall was given "the vast majority" of the rights to the Aquaveyor system, and his interest in Crowne was reduced to 13.3 percent. Tr. at 248. The purported trust document was not introduced into evidence. Mister Mann conceded that it was never submitted to BLM and that approval of the assignment of the lease to the trust had never been sought. Tr. at 280–81. Nor was any document introduced into evidence to support Mr. Mann's description of the ownership interests in Crowne. Tr. at 282. He explained that stock had not been issued for the company, but "[i]f it were to be issued, [he] had a list of how it was going to be issued," that was kept in a desk drawer. Tr. at 282–83. Mister Mann testified that he had made oral commitments to his children to issue them stock in the future to repay them for loans and for the time they devoted to the lease. Tr. at 284.

Mister Mann also explained the circumstances in which he came to learn that the lease was terminated. By the summer of 1995, he and his wife were convinced that by the following summer the deal with the Klumph investor group would be reached, and they began to plan a move to Las Cruces. Tr. at 224–25. In August 1995, before the school year resumed, he and his wife drove down to Las Cruces to talk with the local BLM office about the possibility of placing a home on the leased lands that would utilize the geothermal energy under his lease. Tr. at 225. At this impromptu meeting, they were informed that the lease was cancelled after the notice letter, sent to the wrong address, was returned to BLM as undeliverable. Tr. at 225–26.

### 3. *Kelvin D. Mann*

Plaintiff's son, Kelvin D. Mann, testified that he had assisted his father in marketing the geothermal resources in 1991. Tr. at 329. Through his accountant he had learned that an entity called Challenge Properties was assembling a proposal to participate in a federal program promoting "offshore investments into American-based companies," and was looking for projects to include in their

proposal. Tr. at 329–31. After a conference call concerning the matter, he and Mr. Hall submitted a business plan for inclusion in the proposal, but the applicant was not accepted into the program. Tr. at 331–34.

### 4. Larry R. Hall

Larry R. Hall, former Vice President of Chaffee and of Crowne, see Tr. at 341, 374, testified concerning his involvement in the efforts to market lease NM 40957, and his work developing the Aquaveyor greenhouse concept. Mister Hall confirmed that his employment contract with Chaffee was renewable annually, and paid him $45,000 plus benefits, and that he had only been paid three months' of salary for the second year of the contract. Tr. at 342–43. From March 1983 until mid–1985 he continued to serve as an officer of Chaffee and received no pay for his efforts. Tr. at 400–02. He testified that he worked on the project constantly during this period, including the discussions with the city of Las Cruces and the X7 deal. Tr. at 344. He sent "hundreds of letters" to contacts, attempting to market the lease. Id. In 1985 he accepted full-time employment with a Denver engineering firm, and in the next year moved to the Denver office of CRS Sirrine, one of the largest civil engineering firms in the country. Tr. at 344–45, 402. He estimates that he was able to work on the lease fifteen hours per week in 1986. Tr. at 385.

Mister Hall recollected that sometime around the end of 1985, Mr. Mann had promised him "essentially" a half-interest in Crowne, if he were to develop and contribute his design of a unique greenhouse using geothermal water. Tr. at 403. Because his job with CRS Sirrine provided him with a flexible work schedule, he was able to conduct research and attend meetings to advance his greenhouse designs. Tr. at 346–48. From 1987 through 1989, he invested over 4,000 hours into the project. Tr. at 348. Mister Hall's time was corroborated by contemporaneous documents, as he kept track of the time he spent on the project each day in his daily journals. Tr. at 367. His daily journal for 1987 shows 889.5 hours spent on the greenhouse project. Tr. at 368; PX 94. The journal entries for 1988 total 1,642.5 hours. Tr. at 368; PX 94. And Mr. Hall's daily journal for 1989 records 1,677.5 hours spent on the project. Tr. at 368; PX 95. Thus, Mr. Hall has convincingly demonstrated that he spent at least 4,209.5 hours developing his geothermal greenhouse concept.

The end product of Mr. Hall's efforts is the "Aquaveyor Growth Circuit," an ingenious design that uses geothermal water to both heat a greenhouse facility and as the means of circulating plants through the facility. Tr. at 355–56, 358–65; see PX 97A; PX 97B. Mister Hall explained the many benefits of his design, which would be less costly than one which used mechanized conveyor belts, Tr. at 361, dramatically reduced labor costs, Tr. at 362, more efficiently utilized space, Tr. at 362–63, and provided for a more even exposure of plants to sunlight. Tr. at 355–56, 360–61; see also PX 52; PX 53; PX 54. Mister Hall also confirmed that the February 1988 application that Crowne submitted to BLM, seeking a well production utilization permit, see PX 15, was based on an earlier design of the Aquaveyor. See Tr. at 352–53. A month before the trial, Mr. Hall received a commitment of $26 million to fund the construction of an Aquaveyor greenhouse using the geothermal hot water near Bridger, Montana. Tr. at 389–90.

Although Mr. Hall had meticulously kept track of his time spent designing the Aquaveyor from 1987 to 1989, for other years he could only guess. He believed he spent fifteen hours per week on average in 1986 and from 1990 through 1992, and ten hours per week from 1993 through 1995. Tr. at 385–86. He estimated he spent $200 to $300 each month on expenses related to marketing the lease and developing the Aquaveyor, for things such as long distance phone calls, postage, research and travel, from 1986 through 1995. Tr. at 386–87. No documentary evidence was introduced to support these estimates. Mister Hall confirmed that plaintiff did reimburse him for some of his travel, which he did not include in his estimates. Tr. at 387. He also confirmed that Crowne was "certain" in 1995 that the funding was to be arranged to build an Aquaveyor greenhouse on the leased lands, as the investor

group headed by Bruce Klumph was "very excited about building the project." Tr. at 387–89. And he explained that Crowne had anticipated that the investment of $12 to $15 million in the project would be paid back within five years. Tr. at 399.

Mister Hall testified that he believed he had once, "quite a while ago," seen the trust document drawn up by Mr. Mann concerning the NM 40957 lease and Crowne. Tr. at 404. He thought that both the lease and the ownership of the Aquaveyor technology were held in trust for Crowne, but that the trust ended after the lease was terminated. Tr. at 404–06. Mister Hall believed that under a verbal promise from Mr. Mann, he retained a "future interest" of 13.3% of any value that Crowne would have to distribute. Tr. at 407–08. He did not believe that Mr. Mann retained any legal interest in proceeds from the use of the Aquaveyor, but he intended to share the profits with Mr. Mann nevertheless to reward him for their joint efforts. Tr. at 409–10.

### 5. John P. Whittier

Plaintiff's expert in the areas of geothermal energy and the use of geothermal energy by businesses was John P. ("Jack") Whittier. See Tr. at 423, 479–80. Mister Whittier received a B.A. in history from St. Lawrence University, and an M.A. in Technology and Human Affairs from Washington University's School of Engineering. Tr. at 424; JX 15 at 60.[5] While at Washington University he studied energy policy and energy economics, and he was introduced to the renewable resource of geothermal energy by his thesis advisor—who had written his own dissertation on a use of geothermal power. Tr. at 425–26. He worked for nearly two years at Lawrence Berkeley Laboratory, including work on a U.S. Department of Energy project to develop national energy performance standards and to analyze whether energy savings methods (such as the use of additional insulation) would be cost-effective in different regions of the United States. Tr. at 427–30. After working in Boston for one of the leading energy efficiency firms in the nation, he moved to Las Cruces in October 1982 to rejoin his thesis advisor, who had come to NMSU to run its Energy Institute. Tr. at 431–33.

While at NMSU, Mr. Whittier's work included state-funded efforts to promote the use of geothermal resources by greenhouses. Tr. at 439–40. In this capacity, he joined numerous horticultural trade associations, attended trade shows, and organized the first national geothermal greenhouse conference, hosted by NMSU. Tr. at 440–41. The conference showcased the campus heating system—which used geothermal water to heat 33 buildings and a pool, and supplied hot water to several dormitories. Tr. at 441–42. Mister Whittier also secured state funding to build the university's geothermally-heated incubator greenhouse, which provided space for out-of-state growers to establish a toehold in the local market. Tr. at 452–53. At least two local operators of geothermal greenhouses—Alexander Masson and J & K Growers—started their local operations in the NMSU incubator greenhouse. Tr. at 500–01. During his ten years at NMSU, Mr. Whittier visited Mr. Mann's leased lands approximately two hundred times, showing the site to private greenhouse operators, among others. Tr. at 459–60.

Because of his interest in the greenhouse industry, Mr. Whittier began to attend night school, and earned an M.B.A. from NMSU with an emphasis in finance. Tr. at 461. In 1992 he accepted a position with a consulting firm in the renewable energy field, and five and one-half years later moved to a software company. Tr. at 462–64. After five years with the software company, Mr. Whittier joined McNeil Technologies, his employer at the time of trial. Tr. at 464. In his three and one-half years at McNeil Technologies he managed renewable energy projects for public and private clients, doing feasibility studies of uses of biomass and geothermal energy. Tr. at 464–65. He described his

---

5. When citing to Mr. Whittier's expert report, unless otherwise indicated, the Court will use the numbering on the pages of the report itself, starting with the introduction as page one. See JX 15 (which includes a separately-numbered Table of Contents and an unnumbered Glossary and Summary).

geothermal projects in considerable detail. *See* Tr. at 465–76.

Mister Whittier was engaged by plaintiff, through his employer, to prepare an expert report estimating Mr. Mann's economic losses due to the government's breach of the lease agreement. Tr. at 481–82, 484; *see* JX 15. He approached this task as if he were doing a feasibility study for Mr. Mann concerning the business prospects for developing the lease in 1994, the year of the breach. Tr. at 484–86. In Mr. Whittier's opinion, the most likely direct use of the geothermal water from the wells, given its temperature, was to heat greenhouses. *See* Tr. at 485–86, 490. An associate was charged with researching the greenhouse industry circa 1994, and she identified some trends for that time period. Tr. at 483, 490–92. One was the move towards using larger facilities and larger growers, to take advantage of economies of scale, and another was movement "toward more favorable geographic climates." Tr. at 491–92; *see also* JX 15 at 8.

In drafting his report, Mr. Whittier attempted to determine whether, in 1994, Mr. Mann could have anticipated that business plans to use the geothermal resource to heat greenhouses would be profitable if implemented. Tr. at 486. Mister Whittier accordingly based his analysis on prospects as they would have appeared in 1994. *Id.* He identified natural gas as the "logical competitor" as a heat source, and looked up the natural gas price for New Mexico commercial customers for 1994, and the 1994 forecast of natural gas prices made by the U.S. Department of Energy's Energy Information Association. Tr. at 506–07; JX 15 at 4, 17. His research indicated that profit margins in the greenhouse industry were low—between one and five percent—and that a survey of growers showed that "control over energy costs" was "one of the predominant issues that affected the bottom line of a greenhouse." Tr. at 511–12; *see* JX 15 at 11. Finding "no documented third party sales of geothermal energy produced from federal resources and used for direct-use applications," JX 15 at 17, for his model Mr. Whittier decided to price the use of geothermal heat relative to the price of natural gas. *See* Tr. at 543. He deter-

mined that a 10% discount from the natural gas price, when combined with the savings due to the relative efficiency of geothermal systems to natural gas, was a suitable inducement for a greenhouse operator to use the geothermal source of heat. *Id.; see also* JX 15 at 17. According to his calculations, this resulted in an effective discount of 25% to 30% from the cost of using natural gas, which was similar in size to the discounts used in two successful municipal systems. Tr. at 583–84, 637–38.

Mister Whittier constructed a model for a twenty-acre greenhouse heated by water from well 12–24, and a forty-acre model in which a second twenty-acre complex used water from well 55–25. JX 15 at 16, 18. He attempted to be conservative in his approach, and assumed the greenhouses would be gradually constructed at a rate similar to that at which the Alexander Masson facility was built in Radium Springs, New Mexico. JX 15 at 24–25; Tr. at 535–36, 548–49. Consistent with this conservative approach, he doubled the length and, hence, the cost, of pipeline for the injection wells which would dispose of the used geothermal water, Tr. at 530, and based pipeline costs on data he had for an urban project, which would necessarily be higher than for a rural project on the leased lands. Tr. at 560; *see also* JX 15 at 29 n. 44. After determining the costs of developing the wells to deliver hot water to the greenhouse facilities, Mr. Whittier then assumed that the capital costs would be financed by a loan at 11.3% interest, the commercial lending rate for 1994. *See* JX 15 at 18; Tr. at 546. He used this same rate as his discount rate in making net present value calculations. JX 15 at 28; Tr. at 568. Based on information he received from bankers and venture capitalists, he determined that a working capital loan that was 20% of the capital costs was appropriate. JX 15 at 18 & n. 37; Tr. at 547–48. He assumed that Mr. Mann would have made a 10% downpayment on the capital loan, and that the loan would be for a twenty-year term. JX 15 at 18. And Mr. Whittier factored in various costs, such as labor, royalty payments, and electricity costs. *See* Tr. at 544, 561–62; JX 15 at 28–31.

For the revenues that Mr. Mann should have expected the two plans to generate, from the vantage point of 1994, Mr. Whittier first determined the heating needs of the greenhouses based on the volume completed in each year. *See* Tr. at 534–36; JX 15 at 14–15. For the first year, he based the price of the geothermal water used at a 10% discount off of the natural gas price for 1994, and in each ensuing year increased this by the 1% inflation rate and 1.1% natural gas price escalation rate projected by the Department of Energy in 1994. *See* JX 15 at 3, 18, 28; Tr. at 545. He then projected revenues and expenses for a thirty-year period, factored in a 15% depletion allowance and the tax effects of using the Modified Accelerated Cost Recovery System ("MACRS") depreciation rates, *see* JX 15 at 28, 32–33; Tr. at 544–45, and constructed income statements showing net income (or loss) for each of the thirty years. *See* JX 15 at 41–43; JX 17 at 4–6 (corrected calculation for the 40–acre scenario). Mister Whittier then derived balance sheets for both the twenty-acre and forty-acre greenhouse plans, to determine cash flows. Tr. at 565–66; *see* JX 15 at 44–46; JX 17 at 7–9. He then assembled cash flow statements, and used the ending cash balance for each year to calculate whether either plan would have a positive net present value. Tr. at 566–68; *see* JX 15 at 47–49; JX 17 at 10–12.

According to Mr. Whittier's calculations, the net present value, discounted back to 1994, of the plan to use geothermal resources from well 12–24 to heat a twenty-acre greenhouse was $4,203,522. Tr. at 568–69; JX 15 at 18. He calculated that the net present value of the plan to use both wells to heat two twenty-acre greenhouses, in 1994 dollars, was $14,082,223. Tr. at 573; JX 17 at 2. Based on these calculations, Mr. Whittier opined that he had "absolute certainty that the resource [under NM 40957] is extremely valuable," Tr. at 569–70, 573, and that he had "reasonable certainty" that the net present value numbers he presented were "reflective of lost profits that would have been realized by Mr. Mann." Tr. at 573; *see also* Tr. at 570.

### 6. Bruce A. Fitzgerald

Bruce A. Fitzgerald, the general manager of Alexander Masson's geothermal greenhouse, was called as a witness by plaintiff. *See* Tr. at 679–80. He first joined Alexander Masson in 1987, and was involved with the geothermal greenhouse from its inception. Tr. at 680. His company, headquartered in Kansas City, Missouri, established operations in southern New Mexico because of the advantages of plentiful sunshine, a good labor force, and low humidity. Tr. at 682–83. The geothermal greenhouse, located north of Las Cruces in Radium Springs, *see* Tr. at 503, had grown from an initial four acres in 1987 to seventeen acres by the date of trial. Tr. at 680, 687. Mister Fitzgerald explained that the cost savings from using geothermal hot water allowed the company to grow plants that need extra heat, and to save money by using less insulation. Tr. at 684–86, 690. He described the process by which they used the geothermal water, running it through pipes to a heat exchanger made of metal, which transfers heat to fresh water running through other pipes. Tr. at 688–89. Mister Fitzgerald explained that the heat exchanger building is large enough to heat a greenhouse as large as forty acres, and that the two wells used to heat the operations produce water of a temperature of 158 degrees and 190 degrees Fahrenheit. Tr. at 691–93.

### 7. Joseph I. Torrez

The government's witness, Joseph I. Torrez, was at the time of trial a thirty-year employee of the BLM. He was used solely to authenticate two joint exhibits. *See* Tr. at 696–699; JX 10; JX 11.

### 8. Christopher K. Lane

The government's geothermal energy expert was Christopher K. Lane. *See* Tr. at 700, 740. Mister Lane earned a B.S. in physics from Oregon State University, and an M.S. in nuclear physics from the Naval Postgraduate School at Monterey, California. Tr. at 701–02; Ex. 1 to JX 16 at 1. In his Navy career, he served as a Submarine Officer on a nuclear powered submarine. *See* Tr. at 702; Ex. 1 to JX 16 at 6. Since then, Mr. Lane had acquired more than 25 years'

experience in the private sector in engineering and consulting positions, including over twenty years in the consulting business he founded and owns, Generation Equipment Services Co. *See* Tr. at 708–09; Ex. 1 to JX 16 at 4. Mister Lane, a self-taught engineer, is a registered Professional Engineer in mechanical engineering in California, Washington, and Arizona. Tr. at 719.

Mister Lane testified in considerable detail concerning his experience with cogeneration and alternative energy projects, including geothermal energy projects. *See* Tr. at 710–39. This work entailed economic analysis, *see* Tr. at 718, the designing of wells, Tr. at 720–23, and economic feasibility studies for the use of geothermal facilities. *See* Tr. at 734–37. He explained his use of "engineering economics," a form of "spreadsheet modeling" which "doesn't dwell on the subtleties of tax treatments," but instead simplifies calculations using "either straight-line or some fairly simple depreciation." Tr. at 732–33.

For his analysis of the business prospects for Mr. Mann's leased lands, Mr. Lane looked at the costs and benefits of supplying heat to a ten-acre greenhouse, which he assumed would be "built out all at once." Tr. at 752–53; *see* JX 16 at 13. He assumed the debt would be amortized over twenty years, and used straight-line depreciation over this same period. Tr. at 751. Mister Lane identified certain costs which he believed were omitted or underestimated in Mr. Whittier's model, including heat exchangers, back-up heaters, additional infrastructure improvements, and tools and vehicles. Tr. at 752, 754–55; JX 16 at 12. Mister Lane used the same cost of capital assumptions as Mr. Whittier, employing an 11.3% interest rate, although he had "very strong reservations whether conventional financing is applicable to this [project]." Tr. at 755; *see* JX 16 at 14. And because he believed that cogeneration was an alternative heat source that was 10% to 20% below the cost of natural gas, he assumed that a deeper discount than 10% from the natural gas price would be needed to entice potential customers to use the geothermal heat source. *See* Tr. at 753–54; JX 16 at 5, 14. He based his calculations on geothermal heating which would be sold at

15% and 20% discounts from the natural gas price. JX 16 at 14; Tr. at 759–62. To derive the expected revenues for the proposed sales to a ten-acre greenhouse, Mr. Lane applied these discounts to the average annual price of natural gas for 1994 and the ensuing decade, as that was the actual data available when he wrote his report. *See* Tr. at 750, 755–56, 759–60, 801; JX 16 at 11.

Mister Lane constructed spreadsheets showing the revenue that would have been generated by selling the heat at the two discount prices for years 1994 through 2004, and his estimated costs and expenses for each year. *See* Ex. 2 to JX 16 at 1, 3; Tr. at 759–62. He then adjusted the operating income or loss numbers for each year to reflect taxes and loan repayment, to determine a net cash flow for each year. *See* Ex. 2 to JX 16 at 1, 3. According to his calculations, the sales at the 15% discount price would not have resulted in an operating profit until year eleven of the operation, and the net present value of the cash flows for the first eleven years was negative $29,396. *See* Tr. at 755–56, 760–61; Ex. 2 to JX 16 at 1. For sales at the 20% discount price, he calculated that the first year an operating profit would be realized was also year eleven, and that the net present value of the cash flow for the first eleven years was negative $105,672. *See* Ex. 2 to JX 16 at 3; Tr. at 755–56, 761–62. Mister Lane concluded "with fairly reasonable certainty that the project would not perform profitably or, if it did, it would be very marginal." Tr. at 756; *see also* JX 16 at 4, 15. He stopped his calculations at year eleven, opting not to project revenue for years in which he had no actual natural gas prices. He explained that he thought it was "not possible" to project natural gas prices for ten years with reasonable certainty. Tr. at 762. Mister Lane opined that he found it "reasonably certain that the project would not have been viable," explaining "it would be extremely marginal o[r] possibly breaking even at best." Tr. at 771. He conceded that it was "possible" that Mr. Mann could have realized a profit using the business model from Mr. Whittier's report. *Id.*

Defendant's expert also identified some risks that needed to be taken into account in

evaluating the prospective use of the geothermal resources under NM 40957. He believed that a long-term contract to sell the heat, with "more sophisticated features," would be required in order to finance both the geothermal and the greenhouse operations. Tr. at 762–63. He thought that the conflicting interests of the geothermal heat seller, facing fixed costs, and his sole customers, greenhouses operating at low margins and sensitive to energy cost increases, posed a particular difficulty. *See* Tr. at 763–65; JX 16 at 20–21. And he also had doubts about the wells' productivity, as he was not aware whether adequate testing had been performed. Tr. at 771–73.

On cross-examination, Mr. Lane acknowledged that economic analyses he had performed for other clients involved projections ten to twenty years into the future. Tr. at 782–83. He confirmed that he never prepared balance sheets in performing these analyses, and agreed with the characterization of these as "worthless" for his consulting work. Tr. at 783. He explained that he did not carry out his calculations beyond year eleven—even though he assumed a twenty-year project for purposes of financing and depreciation—as he "concluded the project wasn't viable" and could not be financed since it did not make money in the first eleven years. Tr. at 791–92; *see also* JX 16 at 11. He also believed that including a working capital loan in the analysis of a business plan was not necessary, as "the basic viability of a project" rests on "the ability to generate profits or not in a reasonable amount of time." Tr. at 791. And while he conceded that he believed the net present value of the cash flow from the proposed business plan would have been positive had he projected revenues and expenses out through the full twenty-year period, he disputed whether this number had any bearing on expected profits. *See* Tr. at 792–95.

## II. DISCUSSION

### A. Principles of Contract Damages

■ A court may award the non-breaching party damages based on either that party's expectancy damages, reliance damages, or restitution damages. Expectancy (lost prof-

its) damages aim to make the non-breaching party whole by awarding him "the benefits [he] expected to receive in the absence of a breach." *Cal. Fed. Bank v. United States*, 395 F.3d 1263, 1267 (Fed.Cir.2005); *see also Energy Capital Corp. v. United States*, 302 F.3d 1314, 1324 (Fed.Cir.2002). A party receiving expectancy damages is said to have been "put in as good a position as he would have been in had the contract been performed." *Bluebonnet Sav. Bank v. United States*, 266 F.3d 1348, 1355 (Fed.Cir.2001) (citation omitted). In order to receive expectancy damages, the plaintiff must show that the measure of damages is reasonably certain, and that damages were caused by the breach and reasonably foreseeable to the defendant. *Cal. Fed.*, 395 F.3d at 1267; *Energy Capital*, 302 F.3d at 1325.

■ Reliance damages are used "to put the non-breaching party in 'as good a position as [it] would have been in had the contract not been made.'" *Am. Capital Corp. v. F.D.I.C.*, 472 F.3d 859, 867 (Fed.Cir.2006) (citing *Westfed Holdings, Inc. v. United States*, 407 F.3d 1352, 1364 (Fed.Cir.2005)). "The purpose of reliance damages is to compensate the plaintiff 'for loss caused by reliance on the contract.'" *Old Stone Corp. v. United States*, 450 F.3d 1360, 1374 (Fed.Cir. 2006) (quoting Restatement (Second) of Contracts § 344(b)(1981)). To recover reliance damages, the plaintiff must demonstrate that the damages were foreseeable to the defendant when the contract was formed. *Am. Capital*, 472 F.3d at 867. Damages are considered foreseeable if they are the natural consequence of the breach, or if the defendant had specific reason to know they would result from the breach. *See id.* Reliance damages "may be reduced by 'any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed.'" *Westfed Holdings*, 407 F.3d at 1369–70 (quoting Restatement (Second) of Contracts § 349).

■ Restitution damages are seen as a final resort or "'fall-back position'" for plaintiffs who cannot prove damages under the expectancy theory. *Hansen Bancorp v.*

*United States,* 367 F.3d 1297, 1309 (Fed.Cir. 2004) (quoting *Glendale Fed. Bank v. United States,* 239 F.3d 1374, 1380 (Fed.Cir.2001)). Restitution damages seek to restore the status quo, to return the parties to the situation they were in before the contract was made. *See id.* Under restitution damages, the non-breaching party recovers "any benefit that he has conferred on the other party by way of part performance or reliance." Restatement (Second) of Contracts § 373. Restitution damages are available whether or not the plaintiff would have gained or lost money as a result of completing the contract. *Mobil Oil,* 530 U.S. at 623–24, 120 S.Ct. 2423.

## B. Findings of Fact and Conclusions of Law

Before turning to the analysis of plaintiff's damages claims, the Court will first consider the nature of Mr. Mann's lease. Because BLM determined that his leased lands contained "a well capable of production in paying quantities," PX 22, it was established that geothermal resources were "produced or utilized in commercial quantities" as Congress had defined these terms. *See* 30 U.S.C. § 1005(d) (2000). Under the law at that time, Mr. Mann was entitled to have his lease run for up to forty years beyond the primary term, provided that he was making "diligent efforts" to utilize the geothermal resources. 30 U.S.C. § 1005(a), (d) (2000). The statement by BLM in the undelivered Lease Determination letter, that "[n]o extension was requested by the lessee beyond the primary term of the lease," PX 28 at 1, was both irrelevant and not true. *See* PX 17 (August 7, 1989 letter containing Mr. Mann's request that the lease be converted to a long term one). Moreover, the Court is convinced by the testimony of Messrs. Mann and Hall that, as a matter of fact, Mr. Mann did make diligent efforts to utilize these resources through the date of breach, and could have established this to BLM's satisfaction. Thus, for purposes of considering any expectancy or lost profits damages, a horizon stretching up to forty years beyond the October 31, 1991 expiration date of the lease's primary term can be employed.

In considering potential uses of the leased lands, the Court is also convinced that the NASA reservation of the land was no bar to surface use by the plaintiff. The concerns raised by NASA pertained to the use of well 12–24, and did not seem to implicate well 55–25. *See* JX 9. Moreover, the presence of the NMSU geothermal greenhouse, a rodeo, and a gravel pit all within close proximity of the NASA towers, Tr. at 664–66, prove that the location of a greenhouse near well 12–24 would not have been incompatible with NASA's use of the land.

### 1. The Claim for Lost Profits

Plaintiff's request for lost profits rests on the presentation of his geothermal business expert, Mr. Whittier. *See* Pl.'s Br. at 13–14. In several respects, the Court found Mr. Whittier the more persuasive of the two geothermal business experts. He came across as very sincere and earnest, and convinced the Court that he was approaching his task with objectivity despite his past advocacy in favor of locating greenhouses on the subject property. His testimony was particularly impressive for a first-time expert witness. But the Court has identified a number of problems with Mr. Whittier's lost profits calculations.

Mister Whittier was assigned a very difficult task, as the breach of Mr. Mann's lease occurred more than eighteen months before Mr. Mann learned of it. The breach, total in its effect, caused the loss of what was potentially an income-producing asset. If the asset were already producing income, or had "'an ascertainable market value,'" the preferred approach to valuing the profits lost due to the breach would be to determine the market value of the asset on the date of the breach. *See First Fed. Lincoln Bank v. United States,* 518 F.3d 1308, 1317 (Fed.Cir. 2008) (quoting *Schonfeld v. Hilliard,* 218 F.3d 164, 176 (2d Cir.2000)). Under this approach, the evaluation of the potential risks is performed by the participants in the market, and the market value is set by their expectations of profits, capitalized and discounted accordingly.

But when the asset in question is not "a widely traded commodity or one in which

there was an actively trading market," *Anchor Sav. Bank v. United States*, 81 Fed.Cl. 1, 90 (2008), the market value approach cannot be used. This is the case for the geothermal resources at issue. In place of a market value, Mr. Whittier attempted to measure whether two particular business plans would have been expected to yield profits, from the temporal vantage point of the date of the breach. These calculations may well determine whether Mr. Mann would have launched either project at the time, had he found a greenhouse grower (or growers) willing to locate on his property. But as estimates of the profits he would have made had such an enterprise been launched, these calculations are wanting. They are based on business plans and revenue estimates which assume that the operations would have begun in 1994. Tr. at 585–86. But as of August 1995, when Mr. Mann learned of the breach, any plans to develop the subject property were still inchoate. Thus, the revenue and expense streams begin in a time period when it is known with certainty no revenue was possible.

This does not pose a simple problem that can be solved by slight adjustments to Mr. Whittier's model, such as delaying the streams by two years, or discounting them by two years. For the interest rate (and discount rate) that was employed was based on 1994 data, and the revenue streams were based on discounts relative to 1994 *projections* of natural gas prices. *See* JX 15 at 17–18, 27. Perhaps if one considered Mr. Whittier's approach as an attempt to determine the value a potential buyer would have placed on Mr. Mann's lease in 1994, the use of 1994 numbers could still be warranted—but the Court is of the belief that this valuation method would then need to consider the likelihood that the heat sales to greenhouses would commence in any of a number of years in the future, as well as the projected interest rates for future years. In other words, a number of different starting points, discounted for risk and the probability that operations would start in each year, would have to be analyzed.

Moreover, as estimates of the profits that Mr. Mann would have made had the business plans been followed, Mr. Whittier's calculations should have reckoned with things as they actually were. At the time of trial, eleven years of actual natural gas prices and, hence, the prices that Mr. Mann would charge under the proposed business plans, were known and available. In determining the reasonableness of lost profits estimates, the Court can look at "actual, factual information that might develop in the period following" the breach, to "give some flesh to the plaintiff's lost profits claim." *Anchor Sav. Bank*, 81 Fed.Cl. at 90. Actual data is certainly more reliable than expectations. *See id.* at 90–91 (citing *Fishman v. Estate of Wirtz*, 807 F.2d 520, 553 (7th Cir.1986); *Neely v. United States*, 152 Ct.Cl. 137, 285 F.2d 438 (1961)).

The Court also doubts that the net present value of the *ending cash balances* for each of thirty years, *see* Tr. at 566–68; JX 15 at 47–49; JX 17 at 10–12, is an appropriate manner in order to calculate lost profits. While the use of discounted cash *flows* may be preferable to discounted net profit streams, as the effects of artificial losses due to depreciation and the like are removed from the early years of the calculation, the Court is not aware of any instances where the cumulative balances, not the flows, are used to calculate profits. It seems to the Court that using the ending cash balances, rather than the difference between the ending and beginning cash balances, would result in counting the same cash a number of different times (as many as thirty, in this case!).

If one were to determine the net present value of Mr. Whittier's two plans on the basis of just the cash flows he presented, the numbers drop to about $449,000 for the twenty-acre project and around $1,560,000 for the forty-acre project. Based instead on the net present value of the net income and losses that were projected, these numbers fall to roughly $300,000 and $1,141,000. But these calculations assume operations starting in 1994. If operations were assumed to start in 1996, when the price of natural gas had fallen by 24% relative to 1994, the net present value of the cash flows would be negative for the twenty-acre project, and be less than $304,000 for the forty-acre project. Both of

these calculations would be negative if net income and losses are similarly adjusted. And the Court could not even begin to estimate what these figures would be if the actual natural gas prices for 1996 through 2004 were incorporated—it seems that net losses would be shown for the period over which actual prices are used, and the projected prices for the future years as of the date of trial were not presented or established.

In any event, there are further difficulties with Mr. Whittier's attempt to project expected profits from the use of NM 40957. He dismisses Mr. Lane's discussion of the conflicts between third-party purchasers of geothermal heat and the producers of the heat as merely identifying "the fundamental capitalistic relationship," PX 49 at 2, or "a fundamental business relationship." Tr. at 581. But it seems to the Court that a business model based on greenhouses occupying the leased land and purchasing heat from Mr. Mann would have to take into account the possibility that the greenhouses might not be able to switch to an alternative source of heat without jeopardizing their right to stay on the federal land. This would raise the risks of the arrangements to them, and complicate the agreement between them and Mr. Mann. Mister Whittier's model did not take into account the contractual terms that would be required for such an arrangement to work, see Tr. at 611–12, and seemed to assume that both buyer and seller would be content with the 10% discount relative to natural gas prices. But Mr. Mann himself testified that the attraction of using geothermal heat was based in large part on "the stability of those costs," which facilitates business planning. Tr. at 322. During the 1994 to 2004 period, natural gas prices were anything but stable, fluctuating from $3.35 to $7.27 per thousand cubic feet. See Ex. 2 to JX at 2. Thus, any model using a price tied to the natural gas price would also be unstable. In the least, this all suggests that a deeper discount factor should have been applied to the net profit or cash flow streams.

Mister Lane's testimony, to be sure, is not above criticism. The Court was not satisfied with his explanation for not continuing his calculations through the full twenty-year period of the project he was analyzing, see Tr. at 791–92, and thought his indifference towards tax consequences was peculiar. See Tr. at 805–06. His selection of a greenhouse as small as ten acres was not adequately justified, he overstated the risks of drilling, see JX 18 at 1; Tr. at 112–13, and misinterpreted an article co-authored by Mr. Whittier. See Tr. at 576–77; PX 49 at 1.

Considering the evidence presented, the Court finds the lost profits claimed by plaintiff to be speculative at best. Given the number of years Mr. Mann had unsuccessfully attempted to market the geothermal resources, a model which assumed that sales of heat to a greenhouse would with certainty occur in any year—let alone in two years in which it could not possibly have occurred, regardless of the breach—affords no basis for determining lost profits due to the government's breach. And without clear proof of *some* lost profits, the Court cannot employ the "jury verdict" approach in this case. See *Bluebonnet*, 266 F.3d at 1357. While Mr. Lane conceded that profits were "possible," Tr. at 771, this is not sufficient to establish their existence, and in any event the evidence presented to the Court would not allow for "a fair and reasonable approximation" of any potential profits. *Bluebonnet*, 266 F.3d at 1357.

### 2. The Claim for Reliance Damages

■ Plaintiff in the alternative requests reliance damages, based on the claims against the investors that he gave up in return for the lease, the value of his time spent to develop the lease, his purported out-of-pocket expenses, and the value of Mr. Hall's time and expenses connected with the lease. See Pl.'s Br. at 42–48. Mister Mann also asserts that the exploration and development costs of his predecessor can be awarded as reliance damages. *Id.* at 50 n. 66.

The Court does not find that Mr. Mann's claims against the investors were adequately documented to utilize them as a basis for an award of reliance damages. Unfortunately, a flood in Mr. Mann's basement, occurring in the summer of 1983 or 1984, destroyed the documents that would have established the size of these claims. See Tr. at 178. Evi-

dence in the record does support Mr. Mann's claim that his base salary was $100,000, however, see PX 93, and the Court is convinced by the testimony that the claims Mr. Mann had were substantial. As a consequence, the Court concludes that the settlement of these claims with the investors represents a bargained-for exchange that courts should not second-guess. See *Bluebonnet*, 266 F.3d at 1357. As Chaffee's successor as lessee, Mr. Mann is entitled to base his reliance damages claim on the actual costs incurred by Chaffee in exploring and developing the lease. See *Amber Res. Co. v. United States*, 538 F.3d 1358, 1381 (Fed.Cir.2008). Indeed, the BLM has determined that $854,521.52 of documented costs incurred by Chaffee could be claimed by Mr. Mann to satisfy diligent exploration requirements. See PX 10; see also PX 9. Mister Gross has also confirmed that these expenses were the direct costs of drilling and exploration, and were reasonable and necessary. Tr. at 92–96; JX 14 at 17, 19. Mister Mann may be awarded this amount as expenditures incurred in reliance on the contract.

To these may be added the rental and royalty payments made by Mr. Mann to BLM. He has requested $6,400 in rental payments and $7,680 in royalty payments. See Pl.'s Br. at 45. The Court finds these amounts adequately documented and proven. See Tr. at 206–07, 233, 236, 274–75; PX 23; PX 59; PX 71; PX 73. He also has proven the payment of a $100 annual premium for the required $10,000 bond for the lease. See PX 60; PX 86; Tr. at 266–67. The Court thus determines that an additional $900, for nine years of bond premium payments, may be recovered.

Plaintiff may not be awarded any reliance damages based on his unsubstantiated expenses, or his undocumented time. The lack of any documentation cannot be explained by the flooded basement, which occurred in 1983 or 1984. See Tr. at 178. Without a more adequate foundation, such as corroborating testimony or a more detailed explanation of his work on the lease, the Court cannot determine the actual extent of his work, nor does it find any reasonable basis in the record for valuing Mr. Mann's time. Particular-ly given the responsibility of lessees to prove diligent efforts, the lack of documentation cannot be excused.

■ Mister Hall did provide a solid basis on which to determine the time he spent developing the Aquaveyor. The Court, however, does not find that this time can be the basis of reliance damages to be awarded to Mr. Mann. Mister Mann does not appear to have been under any legal obligation to compensate Mr. Hall for these efforts, see *Gentex Corp. v. United States*, 61 Fed.Cl. 49, 53 & n. 5 (2004), and any interest that Mr. Hall has in Crowne has no relevance to this action, as the lease was owned by Mr. Mann, not Crowne.

The government has not proven any losses that Mr. Mann would have incurred had the contract not been breached. To the contrary, its expert opined that he "possibly" could have profited from it. Tr. at 771. Thus, Mr. Mann's reliance damages are not subject to any reduction for losses avoided. See *Westfed Holdings*, 407 F.3d at 1369–70; Restatement (Second) of Contracts § 349 (1981). In sum, the Court finds Mr. Mann is entitled to $869,501.52 in reliance damages due to the government's breach of lease NM 40957.

*3. The Restitution Claim*

■ The Court concludes that, in the alternative, the same $869,501.52 damages may be awarded as restitution. The rent and royalties were paid to the defendant, and can unquestionably be recovered. See *Mobil Oil*, 530 U.S. at 623–24, 120 S.Ct. 2423. The required bond was also for the government's benefit. And the Federal Circuit has clearly held, in *Amber Resources Co. v. United States*, 538 F.3d 1358 (Fed.Cir.2008), that, for purposes of restitution, subsequent "leaseholders 'stand in the shoes' of the original lessees." *Id.* at 1378–79 (citations omitted). Just as in *Amber Resources*, the exploration and development of the lease were part of the "due diligence" required by the lease. See *id.* at 1380; PX 10. And since these efforts resulted in two wells that are ready for production, see PX 22; Tr. at 70–71, it is reasonable to value them at the costs incurred by Crowne. For restitution purposes,

the leased lands were returned to the government in a *better* condition than they were in before the lease, due to these two wells and the information obtained from the third. *Cf. Hansen,* 367 F.3d at 1315 (noting restitution is precluded "when the non-breaching party cannot return 'any interest in property that he has received in exchange in substantially as good condition as when it was received by him' ")(quoting Restatement (Second) of Contracts § 384).

### III. CONCLUSION

The Federal Circuit has previously concluded that defendant breached the terms of lease NM 40957, entitling plaintiff to judgment on his first cause of action. After reviewing the testimony and evidence presented at trial, the Court concludes that plaintiff has proven by a preponderance of the evidence that he is entitled to damages in the amount of $869,501.52. The Clerk shall enter judgment for the plaintiff on the first cause of action, in the amount of $869,501.52.

**IT IS SO ORDERED.**

United States Court of Federal Claims.